STATE of Wisconsin, Plaintiff-Appellant-Petitioner,

v.

Dennis D. CALLAWAY, Defendant-Respondent.

Supreme Court

*No. 80–1333–CR. Argued February 3, 1982.—
Decided March 26, 1982.*

(Also reported in 317 N.W.2d 428.)

For the plaintiff-petitioner the cause was argued by *Sally L. Wellman,* assistant attorney general, with whom

on the briefs was *Bronson C. La Follette,* attorney general.

For the defendant-respondent there was a brief and oral argument by *William J. Tyroler,* assistant state public defender.

COFFEY, J. This is a review of a decision of the court of appeals affirming an order of the circuit court for Washington county, Hon. J. TOM MERRIAM, presiding, granting a motion to suppress. The defendant, Dennis Callaway, filed a motion to suppress the physical evidence (marijuana) seized in a warrantless inventory search of an automobile. The trial court, after an evidentiary hearing, found that both the impoundment of the vehicle and the subsequent inventory search of the car, including the glove compartment, were unreasonable and, thus, violative of Callaway's fourth amendment rights. The appellate court affirmed, agreeing with the trial court that the impounding of the automobile was unreasonable and further holding that the state had waived any right to raise the issue of Callaway's standing to challenge the constitutionality of the search by failing to raise the issue in the trial court.

The testimony presented at the hearing on defendant's motion to suppress recites that on May 3, 1979, at approximately 7:15 p.m., West Bend Police Officer Michael Quick stopped a vehicle driven by Dennis Callaway, the defendant-respondent,[1] in the city of West Bend. Officer Quick, recognizing Callaway, ordered him to pull his

---

[1] It is not established in the record who was the actual owner of this vehicle although the defendant's attorney entered a certificate of title into evidence at the motion to suppress hearing identifying someone other than Callaway as the owner of the car. The defendant implied in his argument that at the time of his arrest he was in the process of purchasing the car from the person to whom the car was registered.

vehicle over to the curb because of an outstanding traffic warrant. At the point of Callaway's arrest, parking was not allowed, although street-side parking was permitted by ordinance up until 2 a.m. some 20 feet from the position where Callaway was stopped.

Officer Quick walked up to the car and advised Callaway of the outstanding traffic warrant and that he would have to post $51 or be taken into custody. While approaching Callaway's vehicle, Officer Quick observed a "bong"[2] on the back seat of the automobile. During interrogation at the scene, Callaway stated that he did not have any money on him. Officer Quick then placed Callaway under arrest and told him that he would be transported to the Washington county sheriff's department.

Patrolman Quick next informed Callaway that, pursuant to a police department policy, he had three alternatives to choose from regarding the removal of the car from the scene of the arrest. The three alternatives were: that the police would contact a person of Callaway's choice to remove the vehicle from the street; a tow truck would be called to transport the vehicle to the impoundment lot; or a police officer would drive the vehicle to the impoundment lot, thus saving Callaway towing charges. Callaway stated that he knew of no one he could contact at this time to remove the vehicle from the street. Callaway told Officer Quick that he preferred having an officer drive the vehicle to the police department and gave Quick the keys. Officer Quick radioed for assistance and shortly thereafter, another West Bend police officer arrived and drove the car to the West Bend police department where it was inventoried. Patrolman Quick transported Callaway to the Washington county sheriff's department.

---

[2] A bong is a special type of pipe used in the smoking of marijuana.

Pursuant to the standard police department procedures, a third police officer conducted a complete inventory of the contents of the car, including the glove compartment, at the police garage. The inventorying officer testified that the department inventory procedure is for "the protection of the owner of the vehicle as well as the police department and the community as a whole." The police officer filled out a standard motor vehicle content inventory form as he conducted the inventory.

After the general car inventory was completed, the officer used one of the defendant's keys to unlock the glove compartment. The officer testified that it was the policy of the West Bend police department to inventory the contents of the entire car, including a locked glove compartment, if a key was furnished. Inside the glove compartment, the inventorying officer found a clear plastic bag containing a vegetable substance which was subsequently tested and determined to be marijuana. Based upon this evidence, Callaway was charged with possession of a controlled substance with intent to deliver, contrary to sec. 161.41(1m)(b), Stats., and as a repeater, contrary to sec. 939.62(1)(b), because of a prior conviction for delivery of a controlled substance, contrary to sec. 161.41(1)(b). After a preliminary hearing, Callaway was bound over for trial.

Prior to trial, Callaway filed a motion to suppress the evidence seized during the automobile search, alleging that the inventory search of the car, including the glove compartment, was in violation of his constitutional rights. After an evidentiary hearing and the submission of briefs, the trial court granted the motion to suppress, finding that the impounding of the automobile and the inventory search of the car, including the glove compartment, were unreasonable. The state appealed this finding and order, pursuant to sec. 974.05(1)(d)2, Stats.

The appellate court affirmed the order holding that the impounding of the car was unreasonable under the facts of the case and that the state waived any objection it had to the defendant's standing to challenge the constitutionality of the impoundment and inventory search of the car, including the glove compartment, because that issue was not raised in the trial court.

*Issue*

Was the impounding and subsequent inventory search of the automobile, including the glove compartment, unreasonable under the facts and circumstances of this case and, thus, violative of the defendant's fourth amendment protection against unreasonable searches and seizures?

The fourth amendment protection against unreasonable searches and seizures is applicable to the states through the due process clause of the fourteenth amendment. *Mapp v. Ohio,* 367 U.S. 643, 655 (1961). The fourth amendment protects the rights of people to be secure from unreasonable searches and seizures as follows:

"The Fourth Amendment to the United States Constitution provides:
" 'The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.'

"Art. I, sec. 11, of the Wisconsin Constitution is substantially the same. Warrantless searches 'are *per se* unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions.' *Katz v. United States,* 389 U.S. 347, 357 (1967). These exceptions are 'jealously and carefully drawn.' *Jones v. United States,* 357 U.S. 493, 499

(1958)." *State v. Prober,* 98 Wis. 2d 345, 351, 299 N.W. 2d 1 (1980).

It is well-established that automobile inventory searches are "searches" within the meaning of the fourth amendment and, therefore, subject to the reasonableness standard of that amendment.

"We conclude that the latter line of cases not only compels the conclusion that an inventory search is a 'search,' but also represents the better reasoned approach. An inventory search can be a serious intrusion into the private affairs of the individual. Cases holding that such conduct is not a search limit their inquiry to the question of whether the search is a bona fide inventory. Cases taking the opposite view consider that question, but also concern themselves with the 'reasonableness' of the intrusion, *i.e.,* once it is established that it is not improper to conduct an inventory, the question becomes whether the manner in which the inventory is conducted, its scope, is reasonable. We believe the severity of the intrusion and its possibility for abuse requires this double-barreled protection." *State v. McDougal,* 68 Wis. 2d 399, 409, 410, 228 N.W.2d 671 (1975). *See also: South Dakota v. Opperman,* 428 U.S. 364, 375–76 (1976).

In determining whether an automobile search is reasonable, both this court and the United States Supreme Court have consistently drawn a distinction between automobiles and other areas protected by the fourth amendment. The rationale for this distinction is discussed in the following quotation:

"This Court has traditionally drawn a distinction between automobiles and homes or offices in relation to the Fourth Amendment. Although automobiles are 'effects' and thus within reach of the Fourth Amendment, *Cady v. Dombrowski,* 413 U.S. 433, 439 (1973), warrantless examinations of automobiles have been upheld in circumstances in which a search of a home or office would not. *Cardwell v. Lewis,* 417 U.S. 583, 589 (1974); *Cady v. Dombrowski, supra,* at 439–440; *Chambers v. Maroney,* 399 U.S. 42, 48 (1970).

"The reason for this well-settled distinction is twofold. First, the inherent mobility of automobiles creates circumstances of such exigency that, as a practical necessity, rigorous enforcement of the warrant requirement is impossible. *Carroll v. United States,* 267 U.S. 132, 153–154 (1925) ; *Coolidge v. New Hampshire,* 403 U.S. 443, 459–460 (1971). But the Court has also upheld warrantless searches where no immediate danger was presented that the car would be removed from the jurisdiction. *Chambers v. Maroney, supra,* at 51–52; *Cooper v. California,* 386 U.S. 58 (1967). Besides the element of mobility, less rigorous warrant requirements govern because the expectation of privacy with respect to one's automobile is significantly less than that relating to one's home or office. In discharging their varied responsibilities for ensuring the public safety, law enforcement officials are necessarily brought into frequent contact with automobiles. Most of this contact is distinctly non-criminal in nature. *Cady v. Dombrowski, supra,* at 442. Automobiles, unlike homes, are subjected to pervasive and continuing governmental regulation and controls, including periodic inspection and licensing requirements. As an everyday occurrence, police stop and examine vehicles when license plates or inspection stickers have expired, or if other violations, such as exhaust fumes or excessive noise, are noted, or if headlights or other safety equipment are not in proper working order.

"The expectation of privacy as to automobiles is further diminished by the obviously public nature of automobile travel. Only two Terms ago, the Court noted:

" 'One has a lesser expectation of privacy in a motor vehicle because its function is transportation and it seldom serves as one's residence or as the repository of personal effects . . . . It travels public thoroughfares where both its occupants and its contents are in plain view.' *Cardwell v. Lewis, supra,* at 490.

"In the interests of public safety and as part of what the Court has called 'community caretaking functions,' *Cady v. Dombrowski, supra,* at 441, automobiles are frequently taken into police custody. Vehicle accidents present one such occasion. To permit the uninterrupted flow of traffic and in some circumstances to preserve evidence, disabled or damaged vehicles will often be removed from the highways or streets at the behest of

police engaged solely in caretaking and traffic-control activities. Police will also frequently remove and impound automobiles which violate parking ordinances and which thereby jeopardize both the public safety and the efficient movement of vehicular traffic. The authority of police to seize and remove from the streets vehicles impeding traffic or threatening public safety and convenience is beyond challenge." *South Dakota v. Opperman, supra* at 367, 368, 369. *See also: Thompson v. State,* 83 Wis. 2d 134, 141, 265 N.W.2d 467 (1978).

It is also settled that a police inventory search is among the few exceptions to the warrant requirement of the fourth amendment.

"The search of the automobile was without a warrant. The defendant contends the search was unreasonable and does not fall within any of the recognized exceptions to the constitutional warrant requirement. Some of the exceptions are consent to search, search incident to arrest, a probable cause search, an exigent circumstance search, *a police inventory search,* and an automobile exception to warrantless search." *Thompson v. State,* 83 Wis. 2d 134, 139, 265 N.W.2d 467 (1978). (Emphasis supplied.)

Thus, it is clear that the relevant standard to be applied to the search and seizure in this case is whether the search was reasonable. This court has recognized that there are two aspects of the question of reasonableness to be considered in determining the constitutionality of an inventory search.

"As we view the problem, there are essentially two aspects to the question of reasonableness. First, whether the intrusion was reasonable in the first instance, and second, whether the scope of the intrusion is reasonable. We consider here whether the scope of the search was reasonable, assuming the inventory search itself was justified." *State v. McDougal, supra* at 410.

In this case, challenges have been made to both the reasonableness of the impounding of the vehicle and the

reasonableness of the search of the car, including the locked glove compartment. The challenge to the reasonableness of the impoundment relates to the first of the two aspects of the question of reasonableness set forth in *McDougal, supra,* that is, whether the intrusion was reasonable in the first instance. The second aspect, namely, whether the scope of the intrusion was reasonable, relates more particularly to the challenge to the scope of the search of the car, extending to the glove compartment. First, we address the question of the reasonableness of the impoundment.

The consideration of what constitutes a reasonable and lawful impoundment of a vehicle as a condition precedent to a warrantless inventory search is a question of first impression in this state. In *Bies v. State,* 76 Wis. 2d 457, 251 N.W.2d 461 (1977), we held that this court will independently examine the circumstances of the case to determine whether the constitutional requirement of reasonableness is met, even though in this case, the court of appeals and the trial court concluded that the impounding of the vehicle driven by Callaway was unreasonable.

"On review of an order suppressing evidence, the findings of fact, if any, of the trial court will be sustained unless against the great weight and clear preponderance of the evidence. *State v. Pires, supra,* 55 Wis. 2d 602, 603. However, this court will independently examine the circumstances of the case to determine whether the constitutional requirement of reasonableness is satisfied." *Bies v. State, Id.* at 469.

Whether a search and seizure is unreasonable and, therefore, constitutionally invalid depends upon the facts and circumstances of the particular case.

"The determination of what conduct amounts to an unreasonable search and seizure depends upon the par-

ticular facts of each case." *State v. McDougal, supra* at 410. *See also: South Dakota v. Opperman, supra* at 375.

In the case at bar, Officer Quick ordered Callaway to pull over to the curb because of an outstanding traffic warrant. The officer promptly informed Callaway that he would have to post $51 for the outstanding traffic warrant or he would be taken into custody and transported to the sheriff's department. Had Callaway been able to post the $51, he would only have had to proceed to the police station to pay the $51 and then he would have been free to leave.

Since Callaway was unable to post the $51, it was necessary to convey him to the sheriff's department. At this time, Officer Quick informed Callaway that he had three alternatives to choose from in removing the car from the street. These alternatives were that the police would contact another operator to come and remove the vehicle from the street; the car would be towed to the impoundment lot; or an officer would drive the car to the lot. According to the testimony of Officer Quick, this written policy of the West Bend police department was consistently applied to all vehicle operators taken into custody.

Callaway stated that he did not know of anyone who could come to get the car at that time and, therefore, he freely waived his opportunity to avoid the impoundment. Officer Quick then informed Callaway that he had a choice of having the car towed to the station or allowing another officer to drive the car to the station. Callaway chose to have an officer drive the car and voluntarily surrendered the car keys, including the key to the locked trunk and glove compartment, to the officer.

The defendant argues that the impounding of the vehicle was unreasonable because the car could have been moved a mere 20 feet to a spot where parking was per-

mitted up until 2 a.m., pursuant to a city ordinance. This argument presumes, however, that Callaway would have been released from the custody of the sheriff's department before 2 a.m. Although the defendant argues that Callaway would more than likely be released by that time, the officers could not assume as much. Inasmuch as Callaway did not know of anyone whom he could contact to remove the car and further, since he could not personally post the $51, it is reasonable to assume that the car would have remained on the street illegally parked after 2 a.m.

We also note that if the car had been left unattended on the street, there is more than a possibility that it could have been vandalized or struck by another vehicle in which case it is not unlikely that the owner would claim that the police department was negligent in some manner. It is not unreasonable for the police to avoid such claims by removing the vehicle and placing it in protective custody.

In analyzing the question of what constituted a lawful impoundment as a condition precedent to a warrantless inventory search, the court of appeals concluded that based upon the decisions of several other courts, a vehicle is lawfully impounded if the owner or driver gives his or her informed consent or if there is shown to be a reasonable police need to impound the vehicle. *See: State v. Slockbower,* 79 N.J. 1, 397 A.2d 1050 (1979), and cases summarized therein. Applying this standard to the facts of this case, the court of appeals concluded that the impoundment in the case at bar was not lawful. We reject this conclusion of the court of appeals, however, and hold that the facts of this case satisfy that standard as Callaway was *informed* that the car would be impounded if he could not suggest another driver the police could contact and he *consented* to the impoundment of

the vehicle and voluntarily surrendered his keys to the officer.

We note that several of the cases analyzed by the court of appeals are factually distinguishable from the case at bar and our decision in this case is not necessarily inconsistent with them. For example, in *State v. Bales*, 15 Wash. App. 834, 552 P.2d 688 (1976), the impoundment was found unconstitutional because the defendant indicated that a friend could arrive in a short time to pick up the car and, thus, the impounding of the car was unnecessary. Similarly, in *State v. Goodrich*, 256 N.W.2d 506 (Minn. 1977), the defendant arranged to have his brother pick up the car. In *Granville v. State*, 348 So. 2d 641 (Fla. App. 1977), the car could have been left where it was parked in a friend's driveway and in *People v. Miller*, 7 Cal. 3d 219, 101 Cal. Rptr. 860, 496 P.2d 1228 (1972) the defendant expressly stated that he preferred to assume the risk of leaving his property in the car.

In light of the fact that Callaway was given the three alternatives for the removal of the automobile, the fact that the car was illegally parked at the spot where it was pulled over, and the fact that after a thorough search of the record, we find no indication that the impoundment was a mere pretext for searching the car and the defendant has not argued as much to this court, we hold that the impoundment of Callaway's car was reasonable and, thus, it not violative of the fourth amendment prohibition against unreasonable searches and seizures.

We now discuss the question of the reasonableness of the inventory search made of the car, including the locked glove compartment, since we have concluded the impounding of the vehicle was necessary and reasonable because of the need to protect the vehicle from damage, theft or vandalism and because Callaway was given three alternatives for the removal of the illegally parked car.

Although the trial court found that the inventory search was unreasonable, based upon the decision of this court in *State v. McDougal, supra,* the court of appeals failed to address this issue because of its determination that the impoundment was unreasonable in the first instance. We note that the trial court decision was rendered prior to the decision of this court in *State v. Prober, supra.*

In *Prober,* as in the case at bar, this court was faced with the question of the constitutionality of a police inventory search. In *Prober,* we expressly recognized that the scope of an otherwise valid inventory search is limited by the purpose for which it is undertaken.

"However, as we pointed out in *McDougal,* law enforcement officers may not 'engage in an unlimited search under the guise of a police inventory search.' *State v. McDougal, supra* at 413. This recognizes the benign, non-investigatory nature of inventory searches and the impropriety of engaging in an investigative search of a vehicle under the 'pretext' of inventorying its contents." *Id.* at 352.

We cited the following language from the United States Supreme Court decision in *South Dakota v. Opperman, supra,* as descriptive of the purposes underlying an inventory search:

" 'When vehicles are impounded, local police departments generally follow a routine practice of securing and inventorying the automobiles' contents. These procedures developed in response to three distinct needs: the protection of the owner's property while it remains in police custody, . . . ; the protection of the police against claims or disputes over lost or stolen property, . . . ; and the protection of the police from potential danger.' " *Id.* at 369.

Considering these purposes underlying an inventory search and the reasonableness standard of the fourth amendment, we concluded that the search of an auto-

mobile trunk was within the permissible scope of an inventory search. *State v. Prober, supra* at 352. In reaching this conclusion, we stated that our reasoning would also be equally applicable to glove compartments.

"We are aware that legal authority is to be found both approving and disapproving trunk inventory searches, but in view of the recognized purposes served by inventory searches, we conclude that the better-reasoned cases authorize police inventory searches of locked and unlocked automobile trunks, *glove compartments,* and other compartments of a vehicle in which the owner might reasonably be expected to put personal effects or items of value." (Emphasis supplied.) *Id.* at 353, 354.

The reasons underlying our determination that the search of a trunk or glove compartment was within the permissible scope of an inventory search were fully set forth in *Prober*:

"To exclude these kinds of compartments from the scope of the inventory searches would clearly thwart the first stated objective of protecting the property itself while it is in custody. It is a meritless argument to say that the owner of the car was satisfied with the security offered by these compartments because the storage of a vehicle at a police storage yard for an indeterminate length of time was not likely to be the sort of circumstances the owner had in mind in storing valuables in the car. Even more clearly, the second purpose for these searches, protection of the police against claims of loss, is not served if police do not inventory the entire contents of the vehicle. Police cannot reasonably be expected to defend against claims of loss, whether legitimate or false, reasonable or unreasonable, if they are not permitted to catalog what they took into custody. Moreover, a car owner inclined to make a false claim could be expected to base the claim on property missing from an area the police were not permitted to search. Finally, the third purpose, protection of the police from potential danger, can only be served by allowing police to inventory the contents of automobile trunks and other com-

partments. Whether the potential danger is a weapon which, if stolen, could pose a serious safety threat, explosives or even a leaking spare gasoline container threatening to ignite the vehicle, it can be averted only by permitting police to discover these before the potential harm materializes." *Id.* at 354, 355.

This reasoning as applied to the case at bar is supported by the testimony of the police officer who inventoried the car. Based upon hundreds of inventory searches conducted by the officer, he testified that glove compartments of automobiles frequently are the repository for valuable items such as "checkbooks, bankbooks, personal documents, information on the motor vehicle, et cetera." Additionally, we point out that glove compartments often serve as a place for storing credit cards. Such credit cards are becoming a necessary hazard of life in our plastic society, although significant financial loss can result from the theft and use of the cards by an unauthorized person.

Further, our determination that the inventory search of a car, including the glove compartment, is reasonable is supported by the testimony at the hearing establishing that there have been many prior reports of items being stolen from motor vehicles stored in the West Bend impoundment lot. Although the impoundment lot is secured by a fence, the area is open during the daylight hours and, even though secured at night, frequent acts of vandalism and theft have taken place in the lot after dark in spite of the barbed wire fence. Because of these instances of prior thefts at the impoundment lot, the inventory search was both reasonable and necessary to protect both the owner's property and the police from claims of lost property. The protection of the owner's property and the protection of police from claims of lost or stolen property are two of the justifications for inventory searches set out in *South Dakota v. Opperman,*

*supra,* and the testimony in this case clearly demonstrates that those concerns are actual.

Our decision in *Prober* is consistent with the reasoning of the United States Supreme Court in *South Dakota v. Opperman, supra,* in which that court recognized that a search of glove compartments is within the scope of a reasonable inventory search as it is a customary place for documents of ownership and registration besides being a place where valuables are often stored:

"These cases have recognized that standard inventories often include an examination of the glove compartment, since it is a customary place for documents of ownership and registration, *United States v. Pennington, supra,* at 251, as well as a place for the temporary storage of valuables." *Id.* at 372.

Similarly, our decision in the case at bar is in harmony with the rationale of the *Opperman* decision in which the United States Supreme Court reached the conclusion that car inventories pursuant to standard police procedures are reasonable since the search in the case at bar was conducted according to the West Bend police department standard inventory procedure.

"The decisions of this Court point unmistakably to the conclusion reached by both federal and state courts that inventories pursuant to standard police procedures are reasonable." *Id.* at 372.

Thus, after a review of the decisions of the United States Supreme Court and the facts of this case, we find no reason to modify our decision in *Prober* and consistent therewith, we hold that the inventory search of the car, including the glove compartment, was within the permissible scope of an inventory search.

In light of our holding that both the impoundment and the subsequent inventory search of the car driven by

Callaway were reasonable and constitutionally valid, we reverse the decision of the court of appeals and the order of the trial court.

When we granted the petition to review in this case, we requested that the parties brief the issues discussed above as well as the issue of whether this court should follow the lead of the United States Supreme Court in abandoning the doctrine of automatic standing. Since the parties to this case have fully briefed the additional question of whether Wisconsin should retain the rule of "automatic standing," we deem it appropriate to resolve that issue at this time.

This court, following the United States Supreme Court's holding in *Jones v. United States*, 362 U.S. 257 (1960), establishing a rule of "automatic standing" permitting a defendant charged with a crime of possession to challenge the legality of a search that produced evidence against him regardless of whether his own fourth amendment rights had been violated by that search and seizure, applied the automatic-standing rule in Wisconsin. *See: State v. Monahan*, 76 Wis. 2d 387, 251 N.W.2d 421 (1977); *State v. Mabra*, 61 Wis. 2d 613, 213 N.W.2d 545 (1974), and *State v. Christel*, 61 Wis. 2d 143, 211 N.W.2d 801 (1973). These cases followed *Jones* and their holdings were grounded in federal law concerning the fourth amendment protections, absent any analysis of state constitutional law.

Recently, the United States Supreme Court, in the decision of *United States v. Salvucci*, 448 U.S. 83 (1980), expressly abolished the rule of automatic standing established in *Jones* and held that the justifications for that rule have been eliminated in subsequent decisions.

We are fully cognizant, on the other hand, that this court has the prerogative to afford greater protection under our Wisconsin constitution than the United States Supreme Court has declared under the federal constitu-

tion. *State v. Doe,* 78 Wis. 2d 161, 171, 172, 254 N.W.2d 210 (1977).

In considering and weighing the arguments presented by both those in favor of and those in opposition to the rule of automatic standing, we do not feel it is advisable to continue our adherence to the rule granting automatic standing to one charged with a crime of possession. In so doing, we agree with and endorse the reasoning of the United States Supreme Court set forth in *United States v. Salvucci, supra,* and hold that the criminal defendants charged with crimes of possession must first prove that their own constitutional rights have been infringed upon by a search or seizure before they can challenge the constitutionality of that search and/or seizure. The relevant question to be answered in making this determination is whether the defendant had a legitimate expectation of privacy in the place searched.

"[T]he Fourth Amendment rights are personal rights which may not be asserted by another. *Id.* at 133. The inquiry as to whether these personal rights were violated 'requires a determination of whether the disputed search and seizure has infringed on an interest of the defendant which the Fourth Amendment was designed to protect.' *Id.* at 140. In making this determination, the relevant question to be answered is whether the defendant had a legitimate expectation of privacy in the invaded place." *State v. Fillyaw,* 104 Wis. 2d 700, 710, 312 N.W.2d 795 (1981).

*By the Court.*—The decision of the court of appeals is reversed and remanded for further proceedings not inconsistent with this opinion.

SHIRLEY S. ABRAHAMSON, J. (*dissenting*). The defendant was stopped by a police officer in the city of West Bend because of an outstanding unpaid traffic war-

rant in the amount of $51. No crime was involved.[1] The state must prove, as the majority acknowledges, that both the impoundment of the car and the inventory search without a warrant were reasonable. Exceptions to the requirement that a warrant is needed for a search or seizure are jealously and carefully drawn. *Terry v. Ohio*, 392 U.S. 1, 27 (1968) ; *Prober v. State*, 98 Wis. 2d 345, 351, 297 N.W.2d 1 (1980) ; *Bies v. State*, 76 Wis. 2d 457, 463, 251 N.W.2d 461 (1977).

I conclude, as did the circuit court and the court of appeals, that the impoundment of the defendant's car was unreasonable. I further conclude, as did the court of appeals, that the inventory search of the impounded car was unreasonable. I would therefore affirm the decision of the court of appeals affirming the circuit court's suppression order.

*IMPOUNDMENT.* The burden is on the state to present sufficient evidence to show the reasonableness of the impoundment (the seizure of the automobile). Because any exception to the warrant requirement must be narrowly drawn to fit the justification of the exception, the first circumstance to be examined is the reason the police came into contact with the defendant's vehicle. There are at least six reasons that a vehicle may come into the custody of the police: seizure for forfeiture; seizure for evidentiary purposes; seizure to protect a prisoner's property; traffic or parking seizures; seizure of abandoned vehicles; and other non-criminal seizures.

---

[1] A minimum of four and perhaps as many as six West Bend police officers tended to the defendant or his car. There are approximately 34 full-time and part-time officers in the West Bend Police Department. Assuming three shifts, not of equal numbers, I estimate 12 to 16 officers worked on the late afternoon-night shift. Thus one-fourth to one-third of the West Bend Police officers were apparently busy with the defendant or his car for some time between 7:15 and 8:15 p.m.

See sec. VI, Model Rules for Law Enforcement, *Searches, Seizures and Inventories of Motor Vehicles* (Ariz. St. U. College of Law and Police Foundation 1974) (hereinafter referred to as Model Rules for Law Enforcement).

In the case at bar the police took custody of the defendant's car because the defendant happened to be in a car when he was arrested on an offense unrelated to that car and unrelated to his driving at the time of arrest. The police's contact with the defendant's car was a seizure to protect a prisoner's property and is part of what the United States Supreme Court has described as the police's "community caretaking functions, totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute." *Cady v. Dombrowski,* 413 U.S. 433, 441 (1973). See also *South Dakota v. Opperman,* 428 U.S. 364, 368 (1976).

In exercising this caretaking function the police impound a car for three principal reasons: to protect the public good, namely to remove the car from an area because it is a traffic hazard or nuisance; to protect the private citizen, namely to safeguard the vehicle and its contents; and to insulate the police from liability in the event of a false claim of loss. Hence impoundment of the defendant's car in the instant case is reasonable if it can be justified on the basis of these three purposes of the caretaking function.

The state asserts that the written policy of the West Bend police of offering the arrested person the choice of having someone remove the car forthwith or having the car impounded renders the impoundment reasonable, even though other reasonable alternatives which were less intrusive invasions of the defendant's privacy were also available. The state summarizes its position as follows: "Although the state agrees that moving the car would also be a reasonable alternative, it does not believe that failing to do so constituted an unreasonable and un-

constitutional impoundment. . . . A policy of offering only the alternative of having someone move the car is not facially unreasonable." State brief at 32.

I agree with the majority that the state's position should not be adopted. That the officer follows police policy helps protect the impoundment from being challenged as a pretext for an investigatory search[2] but does not relieve this court of its obligation of determining whether the policy meets constitutional standards. "Unconstitutional searches cannot be constitutionalized by standardizing them as part of normal police practices." *State v. Jewell,* 338 So. 2d 633, 640 (La. 1976).

The majority holds that this court will "independently examine the circumstances of the case to determine whether the constitutional requirement of reasonableness is met . . . ." *Supra,* p. 511. The majority then goes on to state that, "[w]hether a search and seizure is unreasonable and, therefore, constitutionally invalid depends upon the facts and circumstances of the particular case." *Supra,* p. 511. My disagreement with the majority relates to the majority's analysis of the facts and circumstances of the case at bar.

The majority recognizes that if the defendant's car could have been parked safely and lawfully within close proximity to the place of arrest, the impoundment would be unreasonable. *State v. Bales,* 15 Wash. App. 834, 552 P.2d 688, 690 (1976). The majority concludes, however, that there was no legal parking place nearby. I disagree.

At the time of defendant's arrest, the car was stopped in a "no parking zone." The record shows that the car could have been parked lawfully a few feet from where the defendant was arrested. The spot became an "illegal" parking spot from 2 a.m. to 6 a.m. The majority,

[2] The majority claims that "after a thorough search of the record, we find no indication that the impoundment was a mere pretext for searching the car." I disagree. *See* the testimony quoted at note 7.

without any basis in the record, leaps to the conclusion that the nearby parking spot was not "legal" because it was reasonable to believe that the defendant would be unable to move his car before 2 a.m. If we are going to speculate, it is more reasonable to hypothesize that because the defendant was arrested on a traffic warrant, he would be incarcerated for less than six hours or that he could have called someone to pick up the car within the six hours. Finally, had the police run a simple check on the title to the car, they would have discovered the car did not belong to the defendant. The police could have called the owner to have the car removed. In any event, Officer Quick testified that even if there was a legal parking place to leave the car, the department's policy was to impound the car unless another operator was available to drive the car away.

In addition, the majority ignores the simple fact that the 2 a.m. to 6 a.m. parking violation with which it is concerned had not yet occurred and that even if it did eventually occur, impoundment might not be the appropriate remedy for the violation. According to the photographs in the record, the legal-later-to-become-illegal parking spot was not marked as a tow-away zone. In *South Dakota v. Opperman*, 428 U.S. 364, 365, (1976), the ordinance involved provided that the vehicles may be towed. See 2 LaFave, *Search and Seizure* sec. 7.3 (c), 559 (violation of parking regulation which does not create a hazard does not inevitably call for impoundment of the offending vehicle).[3]

---

[3] When the Texas Court of Criminal Appeals was faced with a situation similar to the one presented in this case, the Texas court found the state's position that impoundment was reasonable "without merit." The Texas court said: "[w]e cannot agree that a . . .seizure of an automobile [before the parking ordinance was violated] is permissible. Furthermore there was no testimony that it was standard procedure to impound a vehicle for this violation . . . . Also while the [defendant] himself may not have been able

Furthermore the state failed to negate as an alternative to impoundment the availability of a lawful all-night parking spot closer to the place of defendant's arrest than the police station to which the police were going to drive defendant's car. Moving the car to a lawful parking area instead of impounding the car comports with public policy as established by the legislature.[4]

to attend to the vehicle he may have been able to instruct someone to do it for him." *Benavides v. State*, 600 S.W.2d 809, 812 (Tex. Cr. App. 1980).

[4] Sec. 349.13(3), Stats. 1979–80, provides as follows:

"(3) Whenever any traffic officer finds a vehicle standing upon a highway in violation of a prohibition, limitation or restriction on stopping, standing or parking imposed under ch. 346 or this section, the traffic officer is authorized to move the vehicle or to require the operator in charge thereof to move the vehicle to a position where parking is permitted or to either private or public parking or storage premises. The removal may be performed by, or under the direction of, the traffic officer or may be contracted for by local authorities. Any charges for removal shall be regulated by local ordinance. The operator or owner of the vehicle removed shall pay the reasonable charges for moving or towing or any storage involved based upon the ordinance."

Compare the practices of the West Bend police to the procedures set forth in sec. 4–306.4 of the City of Madison Police Department Manual of Policy, Regulations and Procedures which authorizes removal of cars violating traffic or parking regulations to a location on a public street as close as possible to the place of violation, consistent with prevailing traffic conditions:

"4–306.4  **Traffic or Parking Removals**

"Vehicles which are removed from a location on a public street pursuant to traffic or parking regulations shall be classified as 'traffic removals'. When an officer causes a vehicle to be moved pursuant to traffic regulations, the vehicle may be moved to a location on a public street as close to the original location as possible, consistent with prevailing traffic conditions. Vehicles removed shall not be inventoried or searched in any way. However, the officer who caused the vehicle to be removed shall, if possible, close the windows and lock the doors before he leaves the vehicle."

Nor does the state negate as an alternative to impoundment the possibility of allowing the defendant to have the car towed by a towing company to a private lot or to his home. The officer gave the defendant the opportunity to have the car towed by a towing company only to the police station.

The majority relies heavily on *South Dakota v. Opperman* and *State v. Prober* as precedents to justify the reasonableness of the impoundment. This reliance is misplaced. The facts justifying impoundment in those cases are significantly different from the facts of this case. In *Opperman* the police impounded a car which had been illegally parked and had multiple tickets. The court viewed the impoundment as necessary for public safety and convenience. In addition, as the court carefully pointed out, the owner "was not present to make other arrangements for the safekeeping of his belongings." 428 U.S. 364, 375 (1976). In *Prober,* the motel operator claimed the car was wrongfully parked on the motel's private property; the motel operator asked the police to remove the car; and the incoherent owner could not be relied upon to make other arrangements for the car. Thus *Opperman* and *Prober* do not support the holding of the majority that it is lawful to impound a car when the defendant is available to make alternative arrangements for his property.

I do not mean to suggest that the police department must operate a car delivery service for defendants' cars. I would not place a burden on the police to exhaust every possible alternative before the police impounds the vehicle. Nor would I place the burden solely on the person arrested to offer the police officer alternatives to impoundment. But if impoundment is to protect the citizen, the police and the public, then measures short of impoundment which are less costly for the police department, which are less intrusive to the citizen, and

which are readily available should be used. Where the delivery of an auto to a legal parking spot or to the defendant's home is less onerous than having the vehicle brought to the station, that alternative should be offered to the arrested person.

An increasing number of courts require the police to take the initiative with respect to suggesting alternative dispositions of the car to the offender and require the police to comply with a reasonable, lawful, disposition which the offender proposes. See cases cited in *New Jersey v. Slockbower*, 79 N.J. 1, 9–12, 397 A.2d 1050 (1979).[5] I would follow *Slockbower* and the Florida

---

[5] The majority, citing *State v. Slockbower*, 79 N.J. 1, 397 A.2d 1050 (1979), appears to justify the impoundment on the ground that Callaway gave informed consent to the impoundment. *Supra*, p. 513. Callaway did not consent to the impoundment. Since he did not have a friend to call to get the car, the car was going to be impounded. Callaway consented to have the police drive the car to the station at police expense rather than to have a private towing company drive the car to the police station at his expense. There is no basis in the record for concluding that Callaway consented to the impoundment. *See* testimony of officer quoted at note 7 below.

The *Slockbower* case does not support the majority's holding that the impoundment was reasonable. *Slockbower* is representative of a growing number of cases in which the court, before approving impoundment of a motor vehicle, insists on a factual showing of substantial police need. *See also State v. Hardman*, 17 Wash. App. 910, 567 P.2d 238, 240 (1977) (Impoundment of a citizen's vehicle following his or her arrest on a traffic charge is inappropriate when reasonable alternatives to impoundment exist.); *Benavides v. State*, 600 S.W.2d 809 (Tex. Cr. App. 1980); *Session, III v. State*, 353 So. 2d 854 (Fla. App. 1977); *State v. Bales*, 15 Wash. App. 834, 558 P.2d 688 (1976). The *Slockbower* court said:

"It has been persuasively stated in a number of cases, in seeking a rationale that would duly balance the right of privacy against legitimate police safekeeping functions, that if the circumstances that bring a vehicle properly to the attention of the police are such that its driver, even though arrested, is able to make his own arrangements for its custody, or if the

Court of Appeals and hold that "[t]he individual in custody should be advised of and given the choice of leaving the car in its location, contacting someone else to take charge of the car or having it impounded. An individual who is taken into custody ought not have his vehicle impounded, inventoried and towed away under such circumstances where alternative steps can be taken to secure the vehicle *and* the individual is willing to accept the responsibility for the safekeeping of the contents of such vehicle." (Emphasis in original.) *State v. Jenkins,* 319 So. 2d 91, 94 (Fla. App. 1975), quoted with approval, *Session, III v. State,* 353 So. 2d 854, 855 (Fla. App. 1977).[6]

---

vehicle can be conveniently parked and locked without constituting an obstruction of traffic or other public danger, the police should permit that action to be taken rather than impound it against the will of the driver and thereafter search it routinely." 79 N.J. at 9.

[6] Professor La Fave proposes the following requirements for an impoundment to be held reasonable:

"It is submitted that for an impoundment of an arrestee's vehicle to be reasonable under the Fourth Amendment, the arresting officer should be required (i) to advise the arrested operator 'that his vehicle will be taken to a police facility or private storage facility for safekeeping unless he directs the officer to dispose of it in some other lawful manner,' and (ii) to comply with any reasonable alternative disposition requested. Surely, the police should not be expected to undertake delivery of the auto to some distant place or to make any other disposition which would be more onerous than having the vehicle brought to the station. But if the driver asks that his car be left at the scene, and the circumstances are such that it can be lawfully parked in the vicinity, then his wishes should be respected. Likewise, if the driver asks that his car be turned over to a passenger, this should be done if the passenger is not under arrest or otherwise incapacitated and displays a valid operator's license. And even if the car is brought to the station with the arrestee, he should be afforded a reasonable opportunity at the time of booking to arrange for a friend to pick up the car. Such alternative means of disposition serve not only to

It is very possible that the state could have proven in this case that the impoundment was justified because there were no reasonable alternatives to impoundment. But the state did not offer such proof, and I therefore conclude on the basis of this record that the impoundment was unreasonable.

Although I am not willing to accept the state's argument that the officer's compliance with the police regulation in the case at bar renders the search reasonable, I would like to comment further about police department regulations.

On the basis of this record, I am not as confident as the majority as to what the West Bend police regulations are or that the officer was following departmental regulations. The officer testified that the West Bend Police Department had written regulations governing impoundment. The regulations were not read into the record or attached as an exhibit. The police officer's testimony at the preliminary hearing as to the department's regulations differs from his testimony at the suppression hearing.[7] It is therefore difficult to tell

protect the arrestee's possessory and privacy interests in the vehicle but also to relieve the police of continuing responsibility for the car and its contents, and thus are to be preferred over impoundment when one such alternative has been requested by a properly-advised arrestee and can reasonably be accomplished under the circumstances." (Notes omitted.) 2 La Fave, *Search and Seizure* sec. 7.3, pp. 559–560 (1978).

[7] At the preliminary examination, the officer described the stop and the impoundment as follows:

"*Q.* Why did you stop him [Callaway]? *A.* At briefing that day at 4:00, we had been advised of an outstanding warrant on the subject.

"*Q.* And did you have an occasion to take the Defendant into custody at the scene? *A.* Yes I did.

". . .

"*Q.* Did you have the occasion to call for assistance? *A.* I did call for assistance from Officer Petitti, as when I looked in

from the record just what the West Bend police regulations were, whether the officer knew them and whether the officer followed them.

the vehicle I did see a bong located on the right portion of the rear seat.

"*Q.* What is a bong sir? *A.* A glass object with water in it, used for smoking purposes.

"*Q.* What were you going to have done with the vehicle? *A.* Where I had stopped him is a no parking zone, and the Department does have a policy that all subjects taken into custody, we inventory the vehicle and impound it for safe keeping.

"...

"*Q.* If it would have been a regular parking zone would you have pulled his car away? *A.* Yes sir.

"*Q.* You would have? *A.* Yes sir.

"*Q.* I thought you said it was a policy only where you had a no parking zone when you stopped a vehicle. *A.* No sir, I don't believe that's what I said.

"*Q.* All right why don't you tell me what you did say. *A.* I believe what I said is the vehicle was in a no parking zone and also our department has a policy of anybody we take into custody, we do impound the vehicle and—

"*Q.* You do impound the vehicle at the police station? *A.* It's taken to the police department where it is inventoried and taken to the impoundment lot.

"*Q.* Did you ask the Defendant for the keys to this vehicle? *A.* That's right I indicated to him if we had the keys it would be easier, otherwise we'd call a tow truck, and he'd have to pay for it.

"*Q.* Did he give you the keys to the vehicle? *A.* Yes sir."

At the suppression hearing, the officer described the stop and the impoundment as follows:

"*Q.* Did you have any conversation with Dennis Callaway at that time regarding the vehicle? *A.* Yes, I did.

"*Q.* What was that? *A.* I advised him that it was our department policy, a vehicle that was in an area such as that and we were transporting the owner of the vehicle to the Sheriff's Department, if there was not an operator that we could contact to come and get the vehicle, we would have to impound it for safe-keeping.

"*Q.* Did you ask Mr. Callaway at that time whether he could provide an operator of that vehicle? *A.* Yes, I did.

I am convinced that police departments should estab- lish written procedures to govern impounding and in-

"*Q*. Did you give him an opportunity to provide an operator? *A*. Yes.

"*Q*. What did he tell you, if anything? *A*. He did not know of any that would be able to operate it at that point.

"*Q*. Did you have any further conversation with Mr. Callaway regarding the vehicle at that time? *A*. I then advised him he could have his choice of either having an officer drive the vehicle to the impounding lot, or pay the wrecker fee and could have a wrecker tow it to the lot.

"*Q*. What did he tell you? *A*. He would prefer us to drive it, and he then gave us the keys to it.

"*Q*. Did he give you the keys to the vehicle? *A*. Yes.

"*Q*. After you obtained the keys to that vehicle, what happened? *A*. Officer Lieven then came to our location and operated the vehicle back to the Police Department garage.

"*Q*. And what did you do? *A*. I transported, along with Officer Petitte, Dennis Callaway to the Sheriff's Department.

". . .

"*Q*. OK. Now, in this particular case, there was no question that the person you stopped had the access to the keys? He, in fact, was driving the vehicle, isn't that right? *A*. Yes sir.

"*Q*. You never asked him, did you, whether or not he just wanted to pull his car into the parking zone which was 20 feet ahead of him? *A*. No, sir, I did not.

". . .

"*Q*. . . . you explained the policies to Dennis as to the rights, that he could have the car towed away, or he could have it impounded? *A*. That's right.

"*Q*. And exactly what did you tell him? *A*. That he had the option of either having a tow truck tow it to our impoundment lot, or have our officer drive it to our impoundment lot, therefore saving the wrecker cost.

"*Q*. But, in either event, it was going to be impounded, is that right? *A*. Exactly.

"*Q*. You did not indicate to him that if the tow truck came it could take it to his residence or some other place? *A*. No, sir, that is not the way it works.

"*Q*. Now, Officer, did you, besides seeing that bong, you did not smell any marijuana or observe any marijuana, did you? *A*. No, sir.

ventorying of cars. Police officers impound and inventory cars frequently, and the police officer's discretion and conduct should be guided and controlled by policy determinations made by the police department itself. Police department rulemaking has the advantage of producing rules stated clearly by the police themselves in non-legalese, understandable to police and citizens alike. I believe police rulemaking will in all probability enhance the quality of police decisions, protect the privacy of citizens and the interests of the public, and facilitate the work of the judicial system.[8]

Professor Amsterdam urges that the United States Supreme Court adopt the following rule for determining the constitutionality of police searches and seizures: (1) Unless the search or seizure is conducted pursuant to and in conformity with a statute or police departmental rule, it is unreasonable; (2) the statute or departmental rule must be reasonably particular in describing the circumstances under which the search or seizure should

*"Q.* And when you obtained the keys, did you tell him you needed the keys in order to take it to the police station? *A.* To operate the vehicle, yes."

[8] For a discussion of the need for and desirability of rulemaking by the police department to govern police discretion, *see* Davis, *Discretionary Justice* (1969); Goldstein, *Police Policy Formulation; A Proposal for Improving Police Performance*, 65 Mich. L. Rev. 1123 (1967); Amsterdam, *Perspectives on the Fourth Amendment*, 58 Minn. L. Rev. 349 (1974); Wright, *Beyond Discretionary Justice*, 81 Yale L.J. 575 (1972); McGowan, *Rule-Making and The Police*, 70 Mich. L. Rev. 659 (1972); Caplan, *The Case for Rulemaking by Law Enforcement Agencies*, 36 Law & Contemp. Probs. 500 (1971); Remington, *Review—Davis: Discretionary Justice: A Preliminary Inquiry*, 36 U. Chi. L. Rev. 884 (1969); Remington, *The Role of Police in a Democratic Society*, 56 J. Crim. Law, Criminology & Police Science 361 (1965); A.B.A. Standards for Criminal Justice, Standards Relating to the Urban Police Function, *Law Enforcement Policymaking*, ch. 1, part IV (2d ed. 1980).

be made and in describing the nature of the search and seizure; and (3) the statute or departmental rules must conform to constitutional requirements.[9] This suggestion might have merit in interpreting our state constitutional protections against unreasonable search and seizure.

There are some who say that the drafting and adoption of such rules by police departments is not possible. They are wrong. Just one example that such rules are possible is the Model Rules for Law Enforcement, Searches, Seizures and Inventories of Motor Vehicles, drafted by the project on Law Enforcement Policy and Rulemaking supported by the Police Foundation. These Model Rules appear to have been adapted and adopted by several police departments.[10] The Model Rules set forth a set of procedures for several kinds of seizures and inventory searches. The Model Rule which would have been applicable to this case provides as follows:

"Rule 603  **Prisoner's Property.**
"A. *Definition.* When a person is arrested in or around a vehicle which he owns or has been authorized to use, and the vehicle is not otherwise subject to seizure, it shall be classified as prisoner's property.
"B. *Disposition of Prisoner's Property.* A prisoner shall be advised that his vehicle will be taken to a police facility or private storage facility for safekeeping unless he directs the officer to dispose of it in some other lawful manner. In any case where a prisoner requests that his vehicle be lawfully parked on a public street, he shall be required to make his request in writing.
"If the vehicle is found to be the property of a per-

---

[9] Amsterdam, *Perspectives on the Fourth Amendment*, 58 Minn. L. Rev. 349, 416–17 (1974).

[10] *See, e.g.,* City of Madison Police Department Manual of Policy, Regulations and Procedures; District of Columbia Metropolitan Police Department General Order, Series 602, No. 1, quoted in *Schwasta v. United States*, 392 A.2d 1071, 1076 (D.C. Ct. App. 1978).

son having no criminal involvement in the offense, such person shall be notified of the location of the vehicle as soon as practicable.

"C. *Initial Procedure with Respect to Prisoner's Property.* If a vehicle classified as prisoner's property is not taken into police custody, it shall not be inventoried. If it is necessary to take a prisoner's property vehicle into police custody, the vehicle should be taken to a police facility or a location in front of or near a police facility. Immediately upon arrival at a police facility, if the vehicle is not locked, the arresting officer shall remove from the passenger compartment all containers—such as boxes or suitcases—and any other personal property which can readily be seen from outside the vehicle and which reasonably has a value in excess of $25. After removing any such property, the officer shall, if possible, roll up the windows and lock the doors and trunk. Any property so removed shall be brought into the police facility and appropriate entries and returns made. Containers shall not be opened [at this time]; however, they may be sealed to insure the security of their contents. No other inventory or search of the vehicle shall be made at this time.

"[D. *Procedure After 24 Hours.* If, within 24 hours of the time that the prisoner was arrested, a person authorized by the prisoner (or the prisoner himself, if released) does not claim a vehicle which was classified as prisoner's property and taken to a police facility, a complete inventory of its contents shall be made under Rule 607.]" ''

---

'' Sec. 4–306.3 of the Manual of Policy, Regulations and Procedures of the City of Madison Police Department, entitled "Prisoner's Property" sets forth the policy procedure in a case such as the one before us:

"A. *Definition*

"When a person is arrested in a vehicle which he owns or has been authorized to use, and the vehicle is not otherwise subject to seizure, it shall be classified as 'prisoner's property'.

"B. *Disposition of Prisoner's Property*

"The vehicle should be locked and legally parked on the street. If it is not possible to lock the vehicle, any observable items of value should be secured in the trunk of the vehicle. Of course,

The West Bend regulation, as best we can understand it from this record, in contrast to the Model Rules, does not describe with any particularity the circumstances justifying impoundment and offers little protection to the citizen's privacy. For this reason I cannot accept the state's position that the police officer's following police policy renders the search reasonable.

*INVENTORY SEARCH.* Even if it can be said the police took lawful custody of the vehicle in the first instance, lawful custody of an impounded vehicle does not of itself satisfy the constitutional requirement of reasonableness in regard to the search of such vehicle. In testing the reasonableness of the inventory of the locked glove compartment, we must remember that this case involves the "benign non-investigatory" inventory of the car of a person arrested on a minor noncriminal offense. The case does not present the question whether any other exception to the warrant requirement applies. The court is not asked whether the search of the locked glove compartment is valid as a search for which consent was granted, as a search incident to arrest, as a probable cause search, or as a search under exigent circumstances. *Thompson v. State,* 83 Wis. 2d 134, 139, 265 N.W.2d 467 (1978).

Regardless of its benign purpose, an auto inventory is "a serious intrusion into the affairs of the individual." *State v. McDougal,* 68 Wis. 2d 399, 409, 228 N.W.2d 671 (1975). That the police are looking for nothing in par-

---

dependent upon the fact situation, guidelines contained in other subsections may apply. For example, where probable cause exists to believe the vehicle contains seizable items (4–303.3) or where probable cause to believe the vehicle has been stolen or used in a crime exists (4–306.2).

"If the vehicle is found to be the property of a person having no criminal involvement in the offense, such person shall be notified of the location of the vehicle as soon as practicable."

ticular and everything in general does not establish the constitutionality of the search. This kind of random police search is the precise invasion of privacy which the fourth amendment was intended to prohibit. *Mozzetti v. Superior Court*, 4 Cal. 3d 699, 94 Cal. Rptr. 412, 484 P.2d 84, 92 (1971), quoted with approval in *State v. McDougal*, 68 Wis. 2d at 407.

Despite the plethora of words written that privacy in autos is less important than in other areas such as in the home, no court has said that there is no expectation of privacy in an automobile. Each of us does have an expectation of privacy in our car. Indeed the majority's description of the usual contents of a glove compartment makes clear that the locked glove compartment functions as a mobile safety deposit box for many people.

An inventory search, like any exception to the warrant requirement, must extend no further than the exigency that fostered the creation of the exception. As the court said in *State v. McDougal*, 68 Wis. 2d 399, 410, 228 N.W.2d 671 (1975), what is required to determine if the inventory search is reasonable "is a balancing of the state's need to search and the individual's right to be free from intrusion." See also *State v. Prober*, 98 Wis. 2d 345, 356, 297 N.W.2d 1 (1980).[12]

The basis for allowing a warrantless inventory search is to allow the state to respond to three distinct needs: "the protection of the police from potential danger . . . the protection of the owner's property while it remains in police custody . . . and the protection of the police against claims or disputes over lost or stolen property. . . ." *South Dakota v. Opperman*, 428 U.S. 364, 369 (1976). See also *Thompson v. State*, 83 Wis. 2d 134, 140, 265 N.W.2d 467 (1978). None of these objectives

---

[12] For a collection of cases on inventory searches, *see* Annot., *Lawfulness of "Inventory Search" of Motor Vehicle Impounded by Police*, 48 A.L.R.3d 537 (1973).

suffices to justify the inventory search in the case at bar.

First, there is no claim in this case that the inventory was performed to protect the police from potential danger.[13]

Second, the inventory cannot be justified as a reasonable measure to protect the owner's valuables inside the locked glove compartment of the impounded car. While protecting the contents for the benefit of the owner has merit where the vehicle is abandoned or the owner or other authorized person cannot for one reason or other cope with the question of safeguarding any valuables in the car, the justification has little if any merit where, as in this case, the owner or authorized driver is present and can be questioned about valuable items and possible arrangements for their disposition. As the Montana Supreme Court stated, "It would be anomalous to justify a search of an automobile to be for the owner's benefit, when the owner is available but does not consent to the search. Surely the property owner is an adequate judge of the treatment of the property that would most benefit him." *State v. Sawyer*, 571 P.2d 1131, 1134 (Mont. 1977). In the circumstances of this case, an inventory search of a locked glove compartment should not have been undertaken without giving the defendant the opportunity to decide whether he prefers the safety of the inventory or the privacy of no inventory. See *State v. Killcrease*, 379 So. 2d 737 (La. 1980); *State v. Marigold*, 82 N.J. 575, 414 A.2d

[13] If the police have probable cause to believe that there is a dangerous item in the car or there is contraband, these objects can be obtained by the police without reliance upon the power to inventory. The police can rely on the "automobile exception." 2 La Fave *Searches and Seizures* sec. 7.4(a), p. 572 (1978); *State v. Prober*, 98 Wis. 2d 345, 357–59, 297 N.W.2d 1 (1978).

1312 (1980) ; *Wagner v. Commonwealth,* 581 S.W.2d 352 (Ky. 1979).[14]

Third, the search cannot be justified as a reasonable measure to protect the police against false claims of lost or stolen property. This court addressed this issue in *State v. McDougal,* 68 Wis. 2d 399, 413, 228 N.W.2d 671 (1975), saying that it had "no doubt that false claims of loss of property have been made against police officers; however the incidence of such claims (none have reached this court) is not such that we should countenance unreasonable invasions of the privacy of others. The police can take reasonable steps to conduct a police inventory to protect themselves against false claims but not unreasonable ones." Further, if the owner has been consulted, as suggested above, and prohibits the search, the risk of loss of any valuables in the car is on the owner, not the police.

[14] In addition, as Professor La Fave has concluded, where the circumstances are such, as they were here, that the impoundment would be for a short time, locking up the car rather than inventorying it suffices to protect the owner and the police. 2 La Fave, *Search and Seizure* sec. 7.4(a), 574 (1978). *See also* Model Rules for Law Enforcement, Rule 603(B) and *Commentary,* p. 64.

Another approach some courts have taken is that under circumstances such as in the case at bar the police may remove from the car and inventory only those valuables in plain view. *See Schwasta v. United States,* 392 A.2d 1071, 1076 (D.C. Ct. App. 1978). In *South Dakota v. Opperman,* the Court noted that the inventory was prompted by the presence in plain view of a number of valuables inside the car. 428 U.S. at 375–76. On remand from the United States Supreme Court the South Dakota Supreme Court held that as a matter of state constitutional law noninvestigative inventory searches "must be restricted to safeguarding those articles which are within plain view of the officer's vision. *State v. Opperman,* 247 N.W.2d 673, 675 (S.D. 1976). This position was also adopted by the Montana Supreme Court. *State v. Sawyer,* 571 P.2d 1131, 1134 (Mont. 1977).

I must say that I find the majority opinion's emphasis on the inventory as needed to protect the police from tort liability somewhat disingenuous. The police run at least as much a risk of tort liability as a result of driving or towing the car to the police department as in failing to inventory. Nevertheless the police move the vehicles, and no one worries about tort claims. Furthermore, the manner in which the inventory was performed in this case probably encourages rather than discourages false claims. A single officer drove the car to the station. Another officer conducted the inventory alone. The owner can easily assert that an item was stolen prior to the inventory or was intentionally omitted from the police records.

Finally, the thesis that the police would be liable for damage to or property taken from a car impounded under the circumstances of this case if the car were left at a fenced impoundment lot with the windows and doors locked appears to be without any legal foundation. The majority cites no cases holding the police liable under such circumstances. Indeed, several courts have viewed this theory of liability with skepticism. See, *e.g.*, *United States v. Lawson*, 487 F.2d 468, 475 n. 9 (8th Cir. 1973); *Mozzetti v. Superior Court*, 4 Cal. 3d 699, 94 Cal. Rptr. 412, 484 P.2d 84, 88–91 (1971); *State v. Opperman*, 228 N.W.2d 152, 159 (S.D. 1975); *State v. Hardman*, 17 Wash. App. 910, 567 P.2d 238, 241–42 (1977); *State v. Sawyer*, 571 P.2d 1131, 1134 (Mont. 1977).

My conclusion that the inventory of the locked glove compartment under the circumstances of this case was unreasonable comports with *Opperman* and *Prober*, the cases upon which the majority places so much reliance. Neither of these cases purports to speak to the question of an inventory search when the owner is available. In

both cases, as the opinions take pains to emphasize, the owner was either physically or "mentally" not available to make arrangements for the safekeeping of his belongings.

The majority appears to read *Opperman* to say that once a car is lawfully impounded a full inventory search is permissible to protect the defendant's goods and to protect the police from liability. As Professor La Fave explains, *Opperman* cannot be read this broadly.

"Although a superficial reading of the plurality opinion in *Opperman* might prompt the conclusion that the Court has given the green light to virtually all police vehicle inventory procedures, this is not the case. The four *Opperman* dissenters quite clearly disagree with the plurality opinion on a multitude of points. Moreover, Justice Powell's cautious concurring opinion, in which he did not more than agree 'that the routine inventory search in this case is constitutional,' also reflects a deep and abiding concern about unrestrained inventories. It is fair to say, therefore, that *Opperman* raises more questions than it answers and that vehicle inventory procedures remain subject to challenge on a variety of grounds." 2 La Fave, *Search and Seizure* sec. 7.4, p. 570.

The majority reads *Prober* to say that whenever there is a valid impoundment, the inventory search can extend to the locked trunk and the locked glove compartment but not to a closed container in the locked trunk. This is too broad a reading of *Prober*. As stated previously, *Prober* involves an "unavailable" owner and a car illegally parked on private premises. In addition, although the *Prober* court spilled much ink discussing inventory search, it ultimately concluded that "the search of the defendant's vehicle, including the trunk, can also be upheld as a probable cause search by virtue of the 'automobile exception' to the warrant requirement," 98 Wis. 2d at 357.[15] Since the *Prober* court held that the police

[15] For a discussion of the "automobile exception" and probable cause, *see Chambers v. Maroney*, 399 U.S. 42 (1970); *Thompson*

had probable cause to believe the auto contained evidence of a crime or contraband, I do not understand how the *Prober* court could have also held that the search was of "the benign, non-investigatory nature" required for a valid inventory search. *State v. Prober,* 98 Wis. 2d 345, 351, 354–55, 297 N.W.2d 1 (1980) (Abrahamson, J. concurring without opinion). This confusion in the *Prober* opinion renders the opinion of dubious precedential value with respect to inventory searches.

In the case at bar the defendant was available to the police; when he was told of the impoundment he was not told there would be an inventory; he was not consulted as to the inventory being conducted, the scope of the inventory, or the disposition of his valuables; and his release from jail could be expected within a short time after arrest. Under these circumstances, I conclude an inventory search of the locked glove compartment unreasonable.

*AUTOMATIC STANDING.* In brief, uninformative *obiter dicta* the majority disposes of the issue of "automatic standing." The discussion is dicta because the majority holds that the search and seizure were reasonable; the issue of the defendant's standing to challenge the search and seizure is therefore unnecessary to the holding of the case.[16]

---

*v. State,* 83 Wis. 2d 134, 265 N.W.2d 467 (1978); and *State v. McDougal,* 68 Wis. 2d 399, 228 N.W.2d 671 (1975) (compares an inventory search and a probable cause search to obtain evidence). *See also* Cosgrove, *Warrantless Container Searches Under the Automobile and Search Incident Exceptions,* 9 Ford. Urban L.J. 185 (1980–81); Moylan, *The Automobile Exception: What It Is and What It Is Not—A Rationale in Search of a Clearer Label,* 27 Mercer L. Rev. 987 (1976).

[16] In any event the defendant in this case need not rely on the automatic standing rule to challenge the search. It is clear from the record that the defendant has standing. The defendant was lawfully present in a vehicle which he was authorized to drive at the time of the stop. The defendant was the sole occupant of the vehicle at the time it was stopped. The defendant

Furthermore, it is unclear what the majority is doing in its discussion of automatic standing. While the majority cites *United States v. Salvucci*, 448 U.S. 83 (1980), in which the United States Supreme Court abandoned the doctrine of automatic standing as a federal constitutional doctrine, it is unclear whether the majority's abolition of the *Jones* automatic-standing rule in Wisconsin is a matter of interpretation of Art. I, sec. 11 of the Wisconsin Constitution (which is never cited in the opinion), federal constitutional law, state public policy, or what. See, Comment, *The Independent Application of State Constitutional Provisions to Questions of Criminal Procedure*, 62 Marq. L. Rev. 596, 609–617 (1979). All the guidance the majority opinion provides comes in the conclusory comment that after weighing the arguments pro and con of "automatic standing," the majority does not "feel it is advisable to continue our adherence to the rule granting automatic standing to one charged with the crime of possession." *Supra* p. 520.

The majority fails to consider the serious criticisms levied against *Salvucci* by the dissenters in *Salvucci* and the commentators and the unresolved question of whether the defendant's statements at the suppression hearing may be used to impeach him at trial. See 3 LaFave, *Search and Seizure* sec. 11.2, pp. 144–145 (Supp. 1982) ;

---

was the one against whom the search was directed. Although the defendant was not the owner of the car, the police officer testified he had seen the defendant driving the car previously, that he thought the defendant owned the car and that he did not know the defendant did not own the car. There is no contention here that the defendant claims the protection of the Fourth amendment as a result of the violation of the constitutional rights of another. These factors establish that the defendant had standing to challenge the validity of the search and seizure without resort to the "automatic standing" rule.

Also, the state did not raise the issue of standing at the trial court.

Slobogin, *Capacity to Contest a Search and Seizure: the Passing of Old Rules and Some Suggestions for New Ones,* 18 Am. Cr. L. Rev. 387 (1981) ; Bradley, *Havens, Jenkins and Salvucci, And The Defendant's "Right" to Testify,* 18 Am. Cr. L. Rev. 419 (1981) ; *The Supreme Court, 1979 Term,* 94 Harv. L. Rev. 77, 196–205 (1980). See also *State v. Alston,* 87 N.J. 531, 436 A.2d 81 (1981) (refusing to follow *Salvucci* and adopting the automatic-standing rule).

It is unfortunate that without analysis the majority blindly follows the erratic course the United States Supreme Court has set in the field of search and seizure. The United States Supreme Court, in interpreting the federal constitution, sets minimum constitutional guarantees, the federal safety net. But the courts of this state and the law enforcement officers of this state should not be hampered by the vagaries of the United States Supreme Court decisions or the confusion and lack of consistency in the United States Supreme Court cases dealing with automobile searches. Our court should set forth as a matter of state constitutional law or as a matter of the administration of criminal justice in this state clear, simple holdings which can be understood and followed by the police, district attorneys and the courts.

The framers of our state constitution relied on the state constitution bill of rights to protect Wisconsin citizens against state government, not on the federal bill of rights. *Laasch v. State,* 84 Wis. 2d 587, 598–99, 267 N.W.2d 278 (1978) (Abrahamson, J. concurring).

The Supreme Court of the State of Wisconsin should —almost as a matter of routine—in cases where civil rights and liberties are involved, first examine the provisions of the Wisconsin Constitution. If the court concludes that the protection of rights can be based on the Wisconsin Constitution, the court should hold that the

*ratio decedendi* is the independent state constitutional ground. Cases interpreting comparable federal constitutional provisions may be persuasive but are not necessarily binding in our interpretation of the state constitution. This methodology will eliminate the need of the Wisconsin Supreme Court to re-tailor its jurisprudence every time the United States Supreme Court shifts direction. The admonition of Justice Smith of the Wisconsin Supreme Court in 1855 in the case of *The Attorney General ex rel. Bashford v. Barstow*, 4 Wis. 567, 785 (*567, *758) (1855), should guide this court today. Justice Smith said:

"The people then made this constitution, and adopted it as their primary law. The people of other states made for themselves respectively, constitutions which are construed by their own appropriate functionaries. Let them construe theirs—let us construe, and stand by ours."

The decision of the court today does not comport with this court's long-standing interpretation of sec. 11, Art. I of the state constitution.

For the reasons set forth, I dissent.

I am authorized to state that Justice Nathan S. Heffernan joins in this dissenting opinion.