STATE of Wisconsin, Plaintiff-Respondent,

v.

Mitchell J. WISUMIERSKI,
Defendant-Appellant-Petitioner.

Supreme Court

*No. 80–1518–CR.  Argued March 4, 1982.——Decided March 30, 1982.*

(Also reported in 317 N.W.2d 484.)

724

For the defendant-petitioner there was a brief and oral argument by *David E. Lehmann, The Legal Clinic, S.C.,* of Madison.

For the plaintiff-respondent the cause was argued by *Daniel J. O'Brien,* assistant attorney general, with whom on the brief was *Bronson C. La Follette,* attorney general.

WILLIAM G. CALLOW, J. This is a review of an April 27, 1981, unpublished decision of the court of appeals which affirmed Dane county circuit court Judge Mark A. Frankel's judgment of conviction of Mitchell J. Wisumierski for going armed with a concealed weapon pursuant to sec. 941.23(1), Stats. 1977.[1]

---

[1] Sec. 941.23(1), Stats. 1977, provides: "Any person except a peace officer who goes armed with a concealed and dangerous

The facts of this case, giving rise to the instant controversy, are as follows. On February 18, 1979, at approximately 2:45 a.m., Dane County Deputy Sheriff Jeffrey Nania stopped a van on the interstate highway outside of Madison because of an unlighted taillight. Deputy Nania approached the vehicle, and the driver stepped out leaving one passenger in the van. Nania asked the driver for his driver's license. He testified that as it was being given to him, he "shined the flashlight around the cab of the van, the immediate front area."[2] Nania noticed that the passenger, Wisumierski, was sitting turned toward him in the vehicle, holding his hands under a thin blanket which covered his lap. Nania stated at trial that a protrusion or lump, which he believed was a gun, extended from Wisumierski's hands. Upon seeing this, Nania "got the driver's license from the driver, stated [he] would be right back, and left the area as quickly as possible to return to [his] squad car." Nania's testimony revealed that at this time he "felt there was a possibility [his] life was in danger. If in fact it was a gun, at that point I was definitely in jeopardy." Nania had told the driver to wait in the van, and he called for backup "because of the possibility that the passenger had a gun" and to check for "wants and warrants of the driver of the vehicle." Nania discovered that the driver, Hans Kubik, was wanted for a parole violation in Wisconsin.

After backup units arrived, Nania informed a state trooper that "there was a possibility that the passenger had a gun underneath the blanket." Because of Nania's apprehension about the possible concealed weapon, he

weapon is guilty of a Class A misdemeanor." *See: State v. Asfoor*, 75 Wis. 2d 411, 433–34, 249 N.W.2d 529 (1977).

[2] The deputy specifically flashed his light "directly on the passenger, on the area occupied by the passenger, the dashboard, the engine cover in the van, in front of the passenger seat."

removed his own gun from its usual position in his holster and carried it in his hand by his side. Nania and the state trooper approached the passenger side of the van and asked Wisumierski to exit the vehicle. At that point Nania testified that the blanket covering the lap of the defendant "had been shifted to the engine cowl or cover in the van." Both the driver Kubik and passenger Wisumierski were searched, and two rounds for a .25 Baretta semi-automatic pistol were discovered in Kubik's pants pocket. Both men were placed in squad cars. The record in this case is unclear regarding when the body searches took place, but apparently Kubik was searched twice, and the second search revealed the ammunition. A check was run on Wisumierski, but there were no warrants out for his arrest. Nania informed Kubik that he was under arrest for a felony warrant "and asked him and Mr. Wisumierski if he would allow Wisumierski to take possession of the vehicle and if Wisumierski would be responsible for it to save it getting towed off to a holding yard." The record does not reveal whether the car keys were turned over to Wisumierski, but apparently agreement had been reached between Kubik and Wisumierski that Wisumierski would take possession of the van to avoid a towing charge. Before Wisumierski entered the van, Nania conducted a search of the vehicle. As he testified at trial:

"I wanted to search the van due to the fact that I had seen the configuration. There was a possibility of a gun. Neither of the two individuals had the gun on them, so by offering Wisumierski to take possession of the van and drive it, to protect all involved and to make a legal sound search, I entered the van and searched the immediate area that the driver would occupy for any type of dangerous weapon."

Nania removed the blanket from the engine cowl and discovered an unloaded .25-caliber Baretta semi-automatic

gun. Nania took the gun from the vehicle, and believing it to be the same weapon that had been under the blanket when it had been on Wisumierski's lap, placed Wisumierski under arrest for a violation of sec. 941.23(1), Stats. 1977.[3]

Wisurmerski brought a motion to suppress the admission of the gun as evidence. Following a pretrial hearing on the motion to suppress, the trial judge issued a memorandum decision and order denying the motion on the grounds that the warrantless search of the van was lawful. The trial judge, citing *Jones v. United States,* 362 U.S. 257 (1960), and its progeny,[4] concluded that Wisumierski had automatic standing to contest the search of the van. He rejected the defendant's alternative ground for standing—dominion and control—concluding that the defendant lacked a sufficient possessory interest in the van to establish standing.

Judge Frankel concluded, however, that probable cause, coupled with exigent circumstances, justified the warrantless search of the van. Wisumierski was convicted of carrying a concealed weapon following a jury trial on August 19, 1980.

On appeal, the court of appeals affirmed defendant's conviction. The court of appeals, in light of the supreme court decision in *United States v. Salvucci,* 448 U.S. 83 (1980), which had not been rendered at the time of trial, reversed the trial court's determination that the defendant had automatic standing but agreed with the trial

---

[3] According to Wisumierski's testimony, he was asleep at the time the van was stopped and his hands were folded beneath a woman's jacket to keep warm as he had no gloves. Wisumierski further testified that, after Kubik reentered the van to await the license check, he pulled a gun out of his pocket, dismantled it, and slid it under a blanket which covered the engine cowling.

[4] *See: State v. Monahan,* 76 Wis. 2d 387, 251 N.W.2d 421 (1977); *State v. Mabra,* 61 Wis. 2d 613, 213 N.W.2d 545 (1974); *State v. Christel,* 61 Wis. 2d 143, 211 N.W.2d 801 (1973).

court that the defendant lacked sufficient dominion and control over the vehicle to establish a legitimate expectation of privacy. Because the court of appeals determined that the defendant lacked standing, it did not address the legality of the search. This court granted review to decide the following four issues:

(1) Should Wisconsin retain the rule of automatic standing to challenge searches and seizures in cases where the defendant is charged with a possessory offense, despite the fact that the United States Supreme Court in the recent *Salvucci* case no longer adheres to the rule?

(2) If this court does follow *Salvucci,* was the court of appeals correct in applying *Salvucci* retroactively in this case?

(3) Was the issue of automatic standing within the jurisdiction of the court of appeals in the absence of the state's filing a cross-appeal from the trial court's decision and order denying defendant's suppression motion?

(4) Did the defendant have standing to challenge the search because he had a sufficient expectation of privacy in the area searched or the item seized at the time the search was conducted?

We have resolved the first issue before us in our decision in *State v. Callaway,* 106 Wis. 2d 503, 520, 317 N.W.2d 428 (1982). There we held: "[W]e agree with and endorse the reasoning of the United States Supreme Court set forth in *United States v. Salvucci, supra,* and hold that criminal defendants charged with crimes of possession must first prove that their own constitutional rights have been infringed upon by a search or seizure before they can challenge the constitutionality of that search and/or seizure."

The question of the validity of a retroactive application of a judicial decision restricting standing to assert

Fourth Amendment claims was not decided in *Callaway,* and we will address that issue here. We note the general rule that decisions overruling or repudiating earlier decisions are accorded retrospective application. *Pagelsdorf v. Safeco Insurance Co. of America,* 91 Wis. 2d 734, 744–45, 284 N.W.2d 55 (1979).

In our decision in *Fitzgerald v. State,* 81 Wis. 2d 170, 174, 259 N.W.2d 743 (1977), we articulated the three-pronged test of (1) purpose, (2) reliance, and (3) effect to determine whether a rule should be applied retroactively. In *Fitzgerald* we stated:

"The criteria to determine whether a new rule should be retroactively applied are: (1) the effect of the new rule on the fact finding process; (2) the extent of reliance by law enforcement authorities on the old standards; and (3) the effect on the administration of justice of a retroactive application of the new standards." *Id.* at 174.

*See: Desist v. United States,* 394 U.S. 244, 249 (1969); *Stovall v. Denno,* 388 U.S. 293, 297 (1967); Beytagh, *Ten Years of Non-Retroactivity: A Critique and a Proposal,* 61 Va. L. Rev. 1557, 1559 (1975); Fairchild, *Limitation of New Judge-Made Law to Prospective Effect Only: "Prospective Overruling" or "Sunbursting,"* 51 Marq. L. Rev. 254, 257 (1967); Mishkin, *The High Court, the Great Writ, and the Due Process of Time and Law,* 79 Harv. L. Rev. 56 (1965). We note that the first prong of the test, purpose, appears to be accorded the greatest weight. *Desist v. United States, supra* at 249.

Justice Rehnquist, using emphatic language in the *Salvucci* decision, addressed the purpose of the rule abrogating "automatic standing":

"We are convinced that the automatic standing rule of *Jones* has outlived its usefulness in this Court's Fourth Amendment jurisprudence. The doctrine now serves only to afford a windfall to defendants whose Fourth Amend-

ment rights have *not* been violated. We are unwilling to tolerate the exclusion of probative evidence under such circumstances since we adhere to the view . . . that the values of the Fourth Amendment are preserved by a rule which limits the availability of the exclusionary rule to defendants who have been subjected to a violation of their Fourth Amendment rights." 448 U.S. at 95 (emphasis in original).

The state contends that the *Salvucci* decision has a positive effect on the fact-finding process. "Relevant and material evidence of guilt is preserved for trial in all cases except those where a defendant's fourth amendment rights are actually violated. Critical evidence is preserved at the expense of no one except the defendant who seeks to benefit from the 'windfall' fourth amendment protection."

Addressing the second prong of the tripartite test, reliance, we note that this prong has been directed toward justified reliance on the part of law enforcement personnel on existing constitutional standards. *Fitzgerald,* 81 Wis. 2d at 174; *Stovall,* 388 U.S. at 297–98. Generally, the state will advance a retroactivity challenge in order to limit the retroactive impact of a decision *expanding* a defendant's constitutional rights. *Linkletter v. Walker,* 381 U.S. 618 (1965). The court will then consider whether failing to apply the decision retroactively will result in denying the defendant a fair trial. *Stovall,* 388 U.S. at 297 (addressing cases dealing with the retroactive application of the right to assistance of counsel). In the instant case the search of the van was conducted under pre-*Salvucci* law, and the trial court afforded the defendant standing which he was not entitled to as a result of our decision in *Callaway*. Therefore, the defendant was tried and convicted under the law granting him "automatic standing" which in no way was prejudicial to him and in fact was beneficial to him. Because the trial court applied constitutional standards which

afforded the defendant greater protection, the typical situation arising under this prong, where a subsequent decision broadened a defendant's rights, was not presented to this court.

Regarding the third prong, effect on the administration of justice, the state argues that the retroactive application of *Salvucci* would affect only a relatively small number of cases commenced before *Salvucci* and being litigated at the lower court levels. The state convincingly argues that any adverse impact on the effective administration of justice is greatly outweighed by the purpose of the *Salvucci* decision: to eliminate "windfall" Fourth Amendment benefits to individuals whose rights were not infringed.

We note that the majority of the Court in *Salvucci* indicated an intent that the decision be applied retroactively. "The respondents relied on automatic standing and did not attempt to establish that they had a legitimate expectation of privacy . . . . We therefore think it appropriate to remand so that the respondents will have the opportunity to demonstrate, if they can, that their own Fourth Amendment rights were violated." 448 U.S. at 95. *See: United States v. Hargrove,* 647 F.2d 411, 413 (4th Cir. 1981) ; *United States v. Goshorn,* 628 F.2d 697, 699–700 (1st Cir. 1980) ; *State v. Honnert,* 399 So.2d 61 (Fla. App. 1981) ; *State v. Nadler,* 628 P.2d 56, 58 (Ariz. App. 1981) ; *State v. Guy,* 298 N.W.2d 45 (Minn. 1980).

We conclude under the tripartite test articulated in *Fitzgerald* that the *Salvucci* decision was properly applied retroactively by the court of appeals.

The third issue before us is whether the issue of "automatic standing" was within the jurisdiction of the appellate court absent the state's having filed a cross-appeal on that issue. We recently addressed this precise issue in *State v. Alles,* 106 Wis. 2d 368, 316 N.W.2d 378

(1981). There we concluded that, when a respondent seeks correction of an error committed by the trial court which, if corrected, would merely support the judgment appealed from, a cross-appeal is *not* required. It is sufficient that the alleged error is called to the attention of the court in the respondent's brief. In light of our decision in *Alles,* holding that the state was not required to cross-appeal from an order or judgment in its favor, we hold that the issue of "automatic standing" was within the jurisdiction of the court of appeals because it was briefed by the parties.

The fourth issue before us is whether the court of appeals erred in holding that the defendant lacked standing to challenge the search because he did not have a legitimate expectation of privacy. If the defendant has the requisite standing, the reasonableness of the search must be addressed because only unreasonable searches are violative of the fourth amendment. *State v. Elam,* 68 Wis. 2d 614, 621, 229 N.W.2d 664 (1975). The party engaging in the per se illegal warrantless search must demonstrate that the search fell within an exception to the warrantless search prohibition. We conclude that, under the circumstances of the instant case, the defendant lacked standing, and even if we determined that defendant possessed the requisite standing, probable cause accompanied by exigent circumstances justified the warrantless search of the van. *See: United States v. Ortiz,* 422 U.S. 891, 896 (1975) (probable cause is the minimum requirement of a lawful search) ; *Coolidge v. New Hampshire,* 403 U.S. 443, 468 (1971) (no amount of probable cause can justify a warrantless search in the absence of exigent circumstances).

The primary objective of the fourth amendment is protection of privacy. *Cardwell v. Lewis,* 417 U.S. 583, 589

(1974). The threshold question before us is whether the defendant had a reasonable expectation of privacy and freedom from state intrusion. *Rakas v. Illinois,* 439 U.S. 128, 140 (1978); *Combs v. United States,* 408 U.S. 224, 227 (1972); *State v. Fillyaw,* 104 Wis. 2d 700, 710–11, 312 N.W.2d 795 (1981); 3 La Fave, *Search and Seizure,* sec. 11.3(e) (1978). We note that in our review of this issue, the trial court's factual findings will be sustained unless they are against the great weight and clear preponderance of the evidence. *Bies v. State,* 76 Wis. 2d 457, 469, 251 N.W.2d 461 (1977); *State v. Carter,* 33 Wis. 2d 80, 90–91, 146 N.W.2d 466 (1966), *cert. denied,* 387 U.S. 911 (1967). The determination of the standing issue, however, involves a question of law, and we are not bound by the lower courts' decisions on this issue. *State v. Fillyaw, supra* at 711.

The defendant claims that prior to the search of Kubik's van, he had obtained dominion and control over the vehicle entitling him to the requisite possessory interest to assert his Fourth Amendment rights. The state responds that prior to and during the search of the van, Deputy Nania possessed dominion and control over the vehicle. We find that the issue of dominion and control is a mixed question of fact and law. Thus the trial court's findings of fact regarding dominion and control will be upheld unless they are against the great weight and clear preponderance of the evidence. *Bies v. State, supra* at 469; *State v. Goebel,* 103 Wis. 2d 203, 221, 307 N.W.2d 915 (1981) (Abrahamson, J., dissenting). The trial judge's memorandum decision reveals the following findings of fact which we conclude are not against the great weight and clear preponderance of the evidence:

"It appears from the facts adduced at the evidentiary hearing, that Officer Nania contemplated allowing the defendant to take possession of the van following Mr. Kubik's arrest and, in fact, told the defendant that Mr. Kubik was turning the vehicle over to the defendant.

However, the defendant at that time was not in the van nor did Officer Nania allow the defendant to get in the van. It appears that upon his own volition Officer Nania decided to search the vehicle prior to allowing the defendant to take control of the vehicle. Nothing indicates that the officer felt he needed the consent of the defendant to do so, nor that he sought the defendant's consent." (Citations to the record omitted.)

The trial judge's conclusion, however, that these facts did not give rise to an expectation of privacy on the part of the defendant is a matter of law which we may independently review.

As Justice Powell, concurring in the *Rakas* decision, commented: "Nothing is better established in Fourth Amendment jurisprudence than the distinction between one's expectation of privacy in an automobile and one's expectation when in other locations." 439 U.S. at 153–154 (Powell, J., concurring). *Accord United States v. Martinez-Fuerte,* 428 U.S. 543, 561 (1976); *Carroll v. United States,* 267 U.S. 132 (1925); *see* Wilson, *The Warrantless Automobile Search: Exception Without Justification,* 32 Hastings L. J. 127, 127–30 (1980).

In the instant case there is no question that Wisumierski was not the owner of the van. The trial court factually concluded that he was not in the van immediately prior to or during the search. Although the record does not reveal who had the keys to the car, we do not view this as a determinative factor. As Justice Powell concluded in *Rakas:* "It is unrealistic—as the shared experience of us all bears witness—to suggest that these passengers had any reasonable expectation that the car in which they had been riding would not be searched after they were lawfully stopped and made to get out." 439 U.S. at 155 (Powell, J., concurring).[5]

---

[5] Justice White's dissenting comments in *Rakas* reflect further on the "rights" of a passenger: "[T]he Court's opinion today declares an 'open season' on automobiles. However, unlawful stop-

Although we find no established test to apply in determining what constitutes dominion and control, other decisions shed light on this issue. In *Jones v. United States,* 362 U.S. at 259, a friend of an apartment tenant was deemed to have dominion and control over the apartment sufficient to provide the requisite standing. Jones not only had permission to use the apartment (his friend was out of town), but he had a key to the apartment which he used to admit himself on the day the search was conducted. Jones kept possessions in the apartment. As the *Rakas* court commented: "Except with respect to his friend, Jones had complete dominion and control over the apartment and could exclude others from it." *Rakas,* 439 U.S. at 149.

Similarly in *Katz v. United States,* 389 U.S. 347 (1967), a defendant using a phone booth was accorded standing. The court noted that the defendant occupied the phone booth, closed the door to exclude all others and paid to place a call. The court concluded that under these circumstances Katz was "entitled to assume that the words he utter[ed] into the mouthpiece [would] not be broadcast to the world." *Id.* at 352.

In *State v. Fillyaw,* 104 Wis. at 714, we recently concluded a defendant lacked a legitimate expectation of privacy in an apartment under the following facts:

"The fact that Fillyaw [the defendant] was not a regular occupant of the premises and had no property interest in the apartment, did not pay rent, food bills, utility bills, owned none of the furniture, had no key to the apartment and only gained access to the apartment when Wanona Jarrett gave him a key and wanted him to be there, taken together, diminish any expectation of privacy which he infers from the fact that he had a few old

ping and searching a car may be, absent a possessory or ownership interest, no 'mere' passenger may object, regardless of his relationship to the owner." 439 U.S. at 157 (White, J., dissenting).

possessions on the premises. Essentially, Fillyaw was nothing more than a paramour of Wanona Jarrett and a part-time babysitter for her children. His expectation of privacy is limited by that relationship. While he may have had a limited expectation of privacy while he was present in the apartment babysitting, the searches in question were conducted while he was absent from the apartment. . . . Thus, Fillyaw no longer retained any control or dominion over the apartment which he might have asserted as a part-time babysitter."

The above-referenced situations dealing with the concept of dominion and control apart from automobiles may be distinguished from the instant case. The relationship between Kubik and Wisumierski may be characterized as a bailor-bailee situation. Because Kubik was to be transported to jail, he intended to give control of the van to Wisumierski in order that it could be driven off the highway. There are two requirements to a valid bailment, however, delivery by the bailor and intent to possess by the bailee. R. Brown, *The Law of Personal Property*, 19–23, 209–23 (3d ed. 1975). In the present case, although agreement had been reached, delivery had not been effected. *Cf. United States v. Eldridge*, 302 F.2d 463, 464 (4th Cir. 1962) (delivery effected prior to search). This finds support in the trial court's factual finding that the defendant was not in the van at the time of the search nor allowed to get in the van. *See: State v. Fillyaw, supra* (searches conducted while defendant absent from apartment) ; *Cf. Jones v. United States, supra; Katz v. United States, supra; United States v. Eldridge, supra; Cotton v. United States,* 371 F.2d 385, 391 (9th Cir. 1967) (thief had standing to object to search of car where he had possession and claimed car as his own) ; *United States v. Festa,* 192 F. Supp. 160, 164 (D.C. Mass. 1960) ; *State v. Boster,* 217 Kan. 618, 539 P.2d 294, 297 (1975). While we would agree that more than one per-

son may have dominion and control over something at a given time, the very essence of that concept includes the right to exclude others. *Black's Law Dictionary*, 573 (Rev. 4th ed. 1968), defines dominion as "[o]wnership, or right to property or perfect or complete property or ownership. Title to an article of property which arises from the power of disposition and the right of claiming it." (Citations omitted.) Black's defines control as "[p]ower or authority to manage, direct, superintend, restrict, regulate, direct, govern, administer, or oversee." *Id.* at 399. Clearly, the defendant at the time the search was conducted lacked the posture that these terms define. Had the defendant taken possession of the van with the intent to comply with the terms of the bailment after the agreement had been reached, a bailment would have occurred, and we might have had a different situation where the defendant, as a bailee and not a mere passenger, would have possessed the requisite dominion and control over the van to be accorded standing. We conclude, however, that the facts before us do not give rise to the level of an expectation of privacy under which the defendant would be accorded Fourth Amendment standing.

Even though we are not required to reach the issue of reasonableness of the search absent a finding of standing, we will comment briefly on this issue. Warrantless searches are per se unreasonable. *Coolidge v. New Hampshire*, 403 U.S. at 470–71; *Katz v. United States*, 389 U.S. at 357; *Dombrowski v. Cady*, 471 F.2d 280, 283 (7th Cir. 1972) *rev'd on other grounds* 413 U.S. 433 (1973); *Ford v. Breier*, 383 F. Supp. 505, 507 (E.D. Wis. 1974). There are but few exceptions to this basic tenet of constitutional law, and to come within one of them it must be shown, by the party seeking to fall within the exception, that the exigencies of the situation rendered a

warrantless search imperative. *Coolidge*, 403 U.S. at 454–55; *United States v. Jeffers,* 342 U.S. 48, 51 (1951); *McDonald v. United States,* 335 U.S. 451, 456 (1948); 2 LaFave, *Search and Seizure,* sec. 7.2(d) and (e) (1978). "[The Fourth Amendment] does not place an unduly oppressive weight on law enforcement officers but merely interposes an orderly procedure under the aegis of judicial impartiality that is necessary to attain the beneficent purposes intended." *United States v. Jeffers, supra* at 51.

In order for the warrantless search to be constitutionally valid, the state must show that probable cause coupled with exigent circumstances made it imperative to conduct the warrantless search. *Coolidge v. New Hampshire,* 403 U.S. at 468. In the 1924 prohibition-era decision, *Carroll v. United States, supra,* the supreme court carved out what has now been termed the "Carroll Doctrine" or the "automobile exception" to the prohibition against warrantless searches under the fourth amendment. 267 U.S. at 153. In *Carroll* the court reasoned that, due to the mobility of automobiles, the opportunity to search was fleeting, making it impracticable to obtain a warrant. The automobile exception to the prohibition against warrantless searches reveals that probable cause accompanied by exigent circumstances will render a warrantless search of an automobile constitutionally permissible.

The recent decisions in this state reveal that "a. very slight showing of exigency" is sufficient to justify a warrantless search of an automobile. *State v. Prober,* 87 Wis. 2d 423, 435, 275 N.W.2d 123 (Ct. App. 1978) *rev'd* 98 Wis. 2d 345, 297 N.W.2d 1 (1980); *Thompson v. State,* 83 Wis. 2d 134, 142, 265 N.W.2d 467 (1978); *Molina v. State,* 53 Wis. 2d 662, 193 N.W.2d 874 (1972),

*cert. denied,* 407 U.S. 923 (1972); *See: Chambers v. Maroney,* 399 U.S. 42, 46–52 (1970) (probable cause sufficient without facts of exigency); *Cf. United States v. Chadwick,* 433 U.S. 1 (1977) (substantial exigent circumstances must exist to justify warrantless search of a closed bag); *Arkansas v. Sanders,* 442 U.S. 753, 766 (1979) (warrantless search of personal luggage must be justified under an exception other than the "automobile exception").

In regard to probable cause, the supreme court has stated that "[the Court] deal[s] with probabilities. These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, [must] act." *Brinegar v. United States,* 338 U.S. 160, 175 (1949); 1 LaFave, *Search and Seizure,* sec. 3.2 (1978). Those factual and practical considerations are tested by whether they would lead any reasonable police officer to believe what was probable under the existing circumstances. *State v. Flynn,* 92 Wis. 2d 427, 285 N.W.2d 710 (1979), *cert. denied,* 449 U.S. 846 (1980); *State v. Russell,* 60 Wis. 2d 712, 718, 211 N.W.2d 637 (1973). We would note that "[t]he range of variables in the fact situations of search and seizure is almost infinite." *Rakas,* 439 U.S. at 156. "[P]robable cause is a variable rather than a fixed test and . . . it permits consideration of the degree of intrusion and the law enforcement need in a particular case." 1 LaFave, *supra* at 451.[6]

---

[6] Justice Jackson, dissenting in *Brinegar v. United States,* 338 U.S. 160, 183 (1949), made this well-known observation on probable cause: "If we assume, for example, that a child is kidnaped and the officers throw a roadblock about the neighborhood and search every outgoing car, it would be a drastic and undiscriminating use of the search. The officers might be unable to show probable cause for searching any particular car. However, I should candidly strive hard to sustain such an action, executed fairly and in good faith, because it might be reasonable to sub-

In the case at bar, Deputy Nania stopped the vehicle in the early morning hours for a traffic violation. Upon observing the defendant, he noted that the defendant's hands were held together under a blanket in such a fashion that Nania believed he was holding a gun. Nania communicated this belief to his backup as he approached the van. Due to his suspicion, Nania removed his gun from his holster as he walked toward the van. Furthermore, prior to the search of the van, Nania had discovered that there was an outstanding felony warrant for the driver of the van and had discovered two rounds of ammunition on him. We conclude that the facts and circumstances of the instant case would lead any reasonably prudent law enforcement officer to believe that there was probably contraband in the vehicle, satisfying the probable cause requirement of the automobile exception under *Carroll*.

In addressing the exigency requirement, we note that the defendant was about to take control of the vehicle and remove it from the highway. Any contraband in the vehicle would be removed. Deputy Nania had a legitimate fear that the gun would be used—either against him or a member of the public if he allowed the defendant to leave with the gun. Under these circumstances the trial court properly concluded that sufficient exigent circumstances existed for Deputy Nania to conduct a probable cause search of the Kubik van prior to obtaining a warrant.

*By the Court.*—The decision of the court of appeals is affirmed.

---

ject travelers to that indignity if it was the only way to save a threatened life and detect a vicious crime. But I should not strain to sustain such a roadblock and universal search to salvage a few bottles of bourbon and catch a bootlegger."

SHIRLEY S. ABRAHAMSON, J. *(concurring)*. In *State v. Callaway,* 106 Wis. 2d 503, 317 N.W.2d 428 (1982), this court, by way of triple-dicta, discarded without reason or justification the automatic standing rule. The dicta of *Callaway,* having apparently survived the test of time—four days—is, by way of dicta in this case, characterized as and elevated to the status of the holding of *Callaway.*

I join the majority in the limited holding of the case: the warrantless search was reasonable under the automobile exception. There was probable cause (objective standard), and there were exigent circumstances (objective and subjective standard, *State v. Prober,* 98 Wis. 2d 345, 365, 297 N.W.2d 1 (1980)).

I am authorized to state that Justice Nathan S. Heffernan joins this concurring opinion.