STATE of Wisconsin, Plaintiff-Respondent,

v.

John F. FRIDAY, Defendant-Appellant.†

Court of Appeals

*No. 86–1484–CR. Submitted on briefs March 10, 1987.—
Decided July 16, 1987.*

(Also reported in 412 N.W.2d 540.)

† Petition to review pending. This petition was not disposed of at the time the volume went to press. Its disposition will be reported in a later volume.

702

For the defendant-appellant the cause was submitted on the briefs of *James J. Ewers* and *Ewers Law Office* of Madison.

For the plaintiff-respondent the cause was submitted on the brief of *Bronson C. La Follette,* attorney general, and *Sharon Ruhly,* assistant attorney general.

Before Gartzke, P.J., Eich and Sundby, JJ.

EICH, J.   John Friday appeals from a judgment convicting him of possession of controlled substances with intent to deliver, in violation of sec. 161.41(1m)(b), Stats. The issue is whether certain evidence seized from Friday's car should be sup-

pressed as the fruit of an unlawful search.[1] We conclude that the warrantless search of the vehicle was illegal and that the evidence should have been suppressed. We therefore reverse.

The facts are not in dispute. On the evening of October 25, 1983, four members of the Madison Metro narcotics squad were eating dinner at a local restaurant when Friday and a woman entered the room and met a man later identified as Tim Gearhardt. One of the officers, Detective Danderand, had read police reports containing statements from confidential informants indicating that Friday was a seller of cocaine and used a telephone/beeper system in making his sales. Danderand noticed that Friday made several trips to the bathroom and made numerous phone calls in response to messages received on his beeper. As a result, he and the other officers decided to keep Friday under observation.

A short time after Friday entered the restaurant, his brother Vaughn arrived. As the two talked, they continually looked in Danderand's direction and Friday appeared to be growing increasingly nervous. Danderand also heard Friday say something that sounded like "we have had problems." Two other men, Stef and Jeff Kundert, then arrived and began talking to Friday. As they talked, they continued to look in

---

[1]Friday also claims the evidence seized from his car should be suppressed because it is the fruit of an illegal arrest. We do not address the issue since the state is not claiming the search was justified as incident to an arrest.

Additionally, Friday claims the seized evidence should be suppressed because the initial seizure of his car was unlawful. We do not decide this issue, since we determine the search itself lacked probable cause.

Danderand's direction. Danderand was aware that both Kunderts had been arrested for drug violations in the past.

After a time, Stef Kundert and Friday left the restaurant. Danderand followed them outside and stood by the front door. Friday and Kundert walked down the street. After they had walked a short distance, the two men stopped, looked back at Danderand, and returned to the restaurant. Friday asked Danderand what he was doing and what he did for a living. Danderand did not tell him, and Kundert and Friday went back inside. A short time later they left again and Danderand followed. The two men kept looking over their shoulders at Danderand as they got into an automobile and drove off. They returned a few minutes later and went back inside.

Shortly thereafter, Stef and Jeff Kundert started to leave the restaurant. Danderand followed them to the foyer, identified himself as a police officer, and said that he wanted to talk to them about possible drug transactions. The men appeared nervous, and Jeff told Danderand that Friday did not sell drugs anymore and that Danderand was simply harassing him.

After this incident, Danderand observed Friday as he sat at the bar making phone calls. He could hear bits and pieces of Friday's telephone conversations. At one point he heard him say: "Jim, you have got to get down here right away, there is problems."

Gearhardt left the restaurant a short time later and Danderand followed him outside and identified himself. Gearhardt said he knew Danderand was watching Friday because he was involved in drugs and that he, Gearhardt, had nothing to do with selling cocaine. Danderand then returned to the restaurant

with Gearhardt and took a seat with the other officers. Friday was seated at the bar a few feet away from them. Linda Stevens, a co-owner of the restaurant, had a short conversation with Friday which concluded with a shake of her head. One of the officers reported to Danderand that Stevens told him Friday wanted her to take a bag into the kitchen area and that "she was aware of what was going on and that there was drugs in the bag and that is why they wanted to get rid of it."

A man named Dino Corti then entered the restaurant and talked briefly with Friday. Corti soon left by the rear door and Officer Klubertanz followed him. At that point Friday looked over at Danderand and said: "[I]f you're going to bust me, bust me."

When Klubertanz got outside, she saw Corti unhooking a car from a tow truck. She immediately contacted police headquarters and learned that the car was registered to Friday. Corti told Klubertanz that there was "dope" in the car, that Friday wanted the car towed, and that he (Corti) did not want anything to do with it. Corti then unhooked the car, got into the tow truck and departed, leaving the car on the street. Klubertanz reported these events to Danderand, who told her to remain with the vehicle.

Friday left the restaurant a few minutes later, at about 8:25 p.m. Danderand followed him, identified himself as a police officer and explained that Friday's car was being detained pending the issuance of a search warrant to look for illegal drugs. He also told Friday that he was free to go. Danderand then reentered the restaurant. When he went back outside a few minutes later, Friday was in custody. Klubertanz explained that after Danderand went inside a woman had approached the car, stated that she was

the owner and wanted to move it. Klubertanz identified herself as a police officer, told the woman the car was registered to Friday and asked for identification. Friday then approached the car and yelled: "don't tell them anything." Friday, key in hand, told the officers he was taking the car and that they would have to physically stop him. He began to open the car door and when Klubertanz tried to stop him, a scuffle ensued. Eventually Klubertanz and another officer handcuffed Friday and arrested him for obstructing an officer.

At that point—about 8:45 p.m.—Lieutenant Pieper arrived on the scene and informed Danderand that he (Pieper) had received a call from someone identifying himself as Dino Corti. The caller told Pieper that Friday had wanted him to tow his car away from the bar and that the caller did not want to do it because there was cocaine in the car. Danderand then arrested Friday for possession of cocaine with intent to deliver. A search of Friday's car produced quantities of cocaine and marijuana.

Although it was not known to the officers at the scene, at approximately 8:30 that evening, Richard Farris, a Dane County Sheriff's deputy, had received a telephone call from Dino Corti. Farris had known Corti for several years and Corti had given Farris information on at least a dozen occasions. Farris had found all Corti's past information to be accurate. Corti told Farris that he had been called to the restaurant to tow Friday's car, that he had recognized several undercover narcotics officers while he was talking to Friday, and that Friday told him that he wanted the car towed because there was cocaine in it. As indicated, this telephone conversation was not communicated

707

to Danderand or any of the other officers on the scene prior to the search of Friday's car.

Friday moved to suppress the evidence seized from his car. The trial court denied the motion and upheld the search, concluding that it was justified under the "automobile exception" to the warrant requirement. Friday eventually entered a plea of no contest to two charges of possession of controlled substances with intent to deliver.

■

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." Warrantless searches are "per se unreasonable." *State v. Wisumierski,* 106 Wis. 2d 722, 737, 317 N.W.2d 484, 492 (1982). A party seeking an exception to the warrant requirement bears the burden of showing the need for it. *Coolidge v. New Hampshire,* 403 U.S. 443, 455 (1971).

■

The state maintains that the search of Friday's car was justified under the automobile exception first announced in *Carroll v. United States,* 267 U.S. 132 (1925). Under this exception, a warrantless search of an automobile is reasonable if there are both exigent circumstances and probable cause to believe the automobile is an instrument of a crime or that it contains contraband. *State v. Donovan,* 91 Wis. 2d 401, 408, 283 N.W.2d 431, 433 (Ct. App. 1979). The state maintains that both requirements were met at the time Friday's car was searched. We disagree. The officers lacked probable cause to believe that drugs were in the car.

The facts relied upon to establish probable cause to search a car must be sufficient to justify the issuance of a warrant. *United States v. Ross,* 456 U.S. 798, 809 (1982). A search warrant may only be issued when "given all the circumstances … including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates,* 462 U.S. 213, 238 (1983). Thus, a valid search of Friday's car could have been conducted only if, considering the totality of the circumstances, a "fair probability" existed that drugs could be found in the car.

The state asserts that Friday's behavior in the restaurant could support an inference that he was dealing in controlled substances. His use of the beeper and the many telephone calls were "consistent with his previous known method of dealing" drugs;[2] he made frequent trips to the bathroom; he interacted with persons known to have been involved in drug violations in the past; he made an unusual request that the bar owner take a bag and put it in the kitchen area, leading her to believe that it contained drugs; and he appeared nervous. Even if we were to agree that, taken together, these facts might be viewed as pointing toward the probability of drug dealing, they establish at most that controlled substances may have been in the restaurant, not in Friday's car. We are

---

[2] A police officer's knowledge of defendant's past criminal behavior is admissible for purposes of resolving exclusion motions. *Donovan,* 91 Wis. 2d at 409 n. 11, 283 N.W.2d at 434.

unwilling to "infer" any suspected drugs from the restaurant into the car.[3]

During all this activity Friday was never seen near his car. The only connection between drugs and the car was Pieper's statement that Corti had said there were drugs in the car. The source of Corti's "knowledge" was not stated. While hearsay information may be relied upon to support a determination of probable cause, "the 'veracity' and 'basis of knowledge' of [the] person[] supplying hearsay" must be taken into consideration when determining whether probable cause to search existed. *Gates*, 462 U.S. at 238. A deficiency in either of these areas may be compensated for by a strong showing as to the other, or by some other indicia of reliability. *Id.* at 233.

Corti was a regular police informant. As such, his motives for giving information are suspect and bring his veracity or reliability into question. *State v. Paszek*, 50 Wis. 2d 619, 630, 184 N.W.2d 836, 842 (1971). Before an informant's statement can be used to support a probable cause determination, there must

---

[3]The state argues that Friday's comment to the woman trying to move his car to not tell the police anything was analogous to a retreat or flight from the police and constitutes "consciousness of guilt," citing *State v. Cheers*, 102 Wis. 2d 367, 391–92, 306 N.W.2d 676, 687 (1981). We do not view this behavior as unequivocally demonstrating Friday's consciousness of guilt. While guilt may have motivated his action, it is equally probable he was trying to protect the woman from getting involved in an unpleasant situation. Regardless of his motive, the comment itself does not make the presence of drugs in Friday's car significantly more likely than did his actions in the bar earlier in the evening. Thus, it cannot justify the search of Friday's car absent more direct evidence of drugs in the car.

be greater proof of his or her reliability than would be required for an ordinary citizen. *Id.* at 631–32, 184 N.W.2d at 843. Evidence that an informant has supplied accurate information in the past is one way of establishing this reliability. *Id.* at 630, 184 N.W.2d at 842.

At the time of Friday's arrest, Danderand knew that Corti had in the past given information to three officers. At least one of these officers, Deputy Farris, had told Danderand that Corti was reliable because he had given Farris accurate information in the past. But Danderand also had reason to question Corti's reliability, for he was aware that on another occasion Corti had recanted his earlier statements to police once the case got to court. Given this information, Corti's reliability at the time of the arrest was only minimally established, if at all.

■ This deficiency can be overcome, however, by a showing of Corti's reasons for knowing there were drugs in Friday's car or some other evidence indicating the reliability of his information. *Gates,* 462 U.S. at 233. At the time Friday's car was searched, the arresting officers were aware only of Corti's statements to Klubertanz and Pieper that Friday wanted the car towed and that drugs were in the car. In neither of these statements did Corti indicate any basis for his assertion that there were drugs in the car. His remarks were conclusory and void of detail. Without more information, the arresting officers could not be sure that his statements were not based on "casual rumor" or Corti's own assessment of Friday's "general reputation." *State v. Boggess,* 115 Wis. 2d 443, 455, 340 N.W.2d 516, 523–24 (1983). While it might be inferred that Corti's knowledge was the

result of his conversation with Friday, we do not choose to draw such an inference in a case where the declarant is a known police informant of questionable reliability.

The state contends that the basis of Corti's knowledge is amply shown by his later statement to Farris that Friday had told him there was cocaine in the car. Although the state concedes this information was never communicated to the officers conducting the search, it maintains that the information could be used to support the decision to search because it was part of the "collective information" within the police department.

In a footnote to *State v. Middleton,* 135 Wis. 2d 297, 312 n. 7, 399 N.W.2d 917, 924 (Ct. App. 1986), we cited *United States v. Clark,* 559 F.2d 420, 424 (5th Cir. 1977), for the proposition that "in determining the existence of probable cause for a search, [the] court looks to the collective knowledge of [the] police ... rather than the sole knowledge of the officer who performed the actual search." But *Clark* is not nearly as broad as the *Middleton* footnote suggests. Indeed, the quotation omits a crucial qualification. The *Clark* court's statement, in its entirety, was: "In addition to examining the totality of the circumstances, *in view of the degree of communication between them,* we look to the collective knowledge of the police officers, rather than the sole knowledge of Officer Kennedy, who performed search of the truck." *Id.* at 424. (Emphasis added.)

The *Middleton* footnote also cites two Wisconsin cases, *Johnson v. State,* 75 Wis. 2d 344, 249 N.W.2d 593 (1977), and *State v. Drogsvold,* 104 Wis. 2d 247, 311 N.W.2d 243 (Ct. App. 1981), for the proposition that the "arresting officer need not have [the] requisite

knowledge for probable cause if the collective knowledge of the police is adequate to sustain the arrest." Here, too, the statement is irrelevant to the issues in *Middleton,* and is *dictum.* As for *Johnson,* the briefs in that case demonstrate that the department's "collective knowledge" actually had been communicated to the arresting officers; they were fully conversant with all of the information about the case that was in the department's possession when they made the arrest. Wis. State Law Library, 3270 *Appendices and Briefs,* case no. 1, Brief of Defendant in Error, 3–7. Thus, Johnson provides no support for the quoted statement. The same is true of *Drogsvold.* Imputation simply was not an issue in that case, and there is nothing in the opinion to indicate that the arresting officers were not acting on information supplied to them by other officers when they went to Drogsvold's house to arrest him for murder. The "collective knowledge" statement was simply tacked on to the court's recitation of the general definition of "probable cause," and *Johnson v. State* was the only authority cited for it.

There are many cases upholding a police officer's probable cause determination when the officer relied on the collective information within the police department relayed through police channels.[4] However, none of them hold that the on-the-scene officer's determination may be based on *uncommunicated* information reposing in other officers elsewhere in the depart-

[4]*Cheers,* 102 Wis. 2d at 388–89, 306 N.W.2d at 685–86; *Schaffer,* 75 Wis. 2d at 677, 250 N.W.2d at 329; *Desjarlais v. State,* 73 Wis. 2d 480, 491, 243 N.W.2d 453, 459 (1976); *State v. Shears,* 68 Wis. 2d 217, 253, 229 N.W.2d 103, 121 (1975); *Rinehart v. State,* 63 Wis. 2d 760, 764–65, 218 N.W.2d 323, 325 (1974); *State v. Mabra,* 61 Wis. 2d 613, 625–26, 213 N.W.2d 545, 551 (1974); *State v. Taylor,* 60 Wis. 2d 506, 515, 210 N.W.2d 873, 878 (1973).

ment. The "collective knowledge" or "imputation" rule has always been couched in terms of the arresting (or searching) officer's "reli[ance] upon a police communication." *Schaffer v. State,* 75 Wis. 2d 673, 677, 250 N.W.2d 326, 329 (1977). In *Schaffer,* the court stated that "[w]here an officer *relies upon a police communication* in making an arrest, in the absence of his personal knowledge of probable cause, the arrest will only be based on probable cause, and thus valid, when such facts exist within the police department." *Id.* (Emphasis added.) *See also, State v. Cheers,* 102 Wis. 2d 367, 388, 306 N.W.2d 676, 685 (1981)("where an arresting officer *is given information through police channels* such as roll call, this court's assessment of whether the arrest was supported by probable cause is to be made on the collective knowledge of the police force."). (Emphasis added.)

A similar conclusion was reached in *Salter v. State,* 321 N.E.2d 760 (Ind. App. 1975), where the police attempted to justify the search of a suspect's purse by use of information in the possession of an officer not on the scene and whose knowledge was never communicated to the searching officer. The court, noting that it is generally permissible to determine the existence of probable cause "on the basis of the collective information known to the law enforcement organization as a whole," held that the searching officer lacked probable cause because "there is no evidence [showing] ... any communication between [the o]fficers. ... There is no evidence that [one] had the benefit of [the other's] information." *Id.* at 762. There is substantial support for such a rule. *See, United States v. Woods,* 544 F.2d 242, 259–61 (6th Cir. 1976) (information in the hands of superior officer could not be used to validate arrest where officer

making arrest was not acting upon the superior's orders); *State v. Crowder,* 613 P.2d 909, 915 (Hawaii App. 1980) ("cannot impute the information received by any other officer to the arresting officer" where there is no evidence that any of the officers "communicated with each other or exchanged information" prior to the arrest); *People v. Creach,* 387 N.E.2d 762, 769 (Ill. App. 1979), *aff'd in part,* 402 N.E.2d 228 ("the ordinary presumption that for purposes of probable cause the knowledge of one officer is imputed to the others involved in the cause" held inapplicable because there had been no communication between the officers in question); *Com. v. Gambit,* 418 A.2d 554, 557 (Pa. Super. 1980), *aff'd per curiam,* 462 A.2d 211 (1983) ("[i]nformation scattered among various officers in a police department cannot substitute for possession of the necessary facts by a single officer related to the arrest").

■

Professor LaFave has called the rule declining to impute an absent officer's uncommunicated knowledge to the searching officer "sound" and states that it "should unquestionably be applied in cases like *Salter,* where the officer who did possess the probable cause was not in a close time-space proximity to the questioned ... search." 2 LaFave, *Search and Seizure,* sec. 3.5(c), p. 17 (1987). We agree and hold that Corti's statements to Farris cannot be used to support the search of Friday's car because the information was not communicated to the officers at the restaurant prior to the time the search was made.

■

The state also argues that the search was proper under the "inevitable discovery" rule announced in *Nix v. Williams,* 467 U.S. 431 (1984). Under *Nix,*

illegally obtained evidence may be admitted "[i]f the prosecution can establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means." *Id.* at 444. The state contends that because Farris's later information confirmed the existence of probable cause to obtain a search warrant and lawfully search Friday's car, the discovery of drugs in the car was inevitable. However, the state has failed to meet its burden of establishing that a lawful search was inevitable. There is nothing in the record, for example, to indicate that the officers would have obtained Farris's information in sufficient time to obtain a warrant or that any drugs would be present in the car at such later time as a warrant might be obtained and executed.

*By the Court.*—Judgment reversed and cause remanded.

GARTZKE, P.J. (*dissenting*). I disagree with the majority's holding that the police lacked probable cause to believe that illegal drugs were in John Friday's car. A warrantless search of an automobile is justified if attended by exigent circumstances and probable cause to believe the automobile is an instrument of a crime or contains contraband. *State v. Donovan,* 91 Wis. 2d 401, 407–08, 283 N.W.2d 431, 433 (Ct. App. 1979). Both elements existed and I would affirm.

*Illinois v. Gates,* 462 U.S. 213, 230 (1983), adopted a "totality-of-the-circumstances" approach when determining probable cause. *Gates* discarded the rigid "veracity," "reliability," and "basis of knowledge" test in favor of a common sense "totality-of-the-circumstances" method which "permits a balanced assess-

716

ment of the relative weights of all the various indicia of reliability (and unreliability) attending an informant's tip." *Id.* at 234. In short, probable cause existed to search Friday's automobile if under the totality of circumstances a fair probability existed that drugs would be found.

I agree with the majority that Friday's behavior in the restaurant supports an inference that he was dealing in controlled substances. The majority, however, concludes that Friday's conduct at most establishes a possibility that he had illegal drugs on his person or in his shoulder bag. The majority states that Friday was never seen near his car and that the only connection between drugs and the car was a phone call from an informant who told Officer Pieper there were drugs in Friday's car. The record reveals more than that.

While the officers watched Friday, a man they recognized as Dino Corti entered the restaurant. Corti had previously served as a police informant. Corti recognized the officers, had a brief conversation with Friday and left.

Officer Klubertanz followed Corti to the restaurant parking lot. Corti was unhooking an automobile from a tow truck. Klubertanz checked the license number and found that the car was registered to Friday. Corti told Klubertanz that Friday wanted the car towed, that there was "dope" in the car, and that he, Corti, did not want anything to do with it. Corti then got in his truck and left. Klubertanz reported all this to Officer Dandurand.

Klubertanz remained with the car. Shortly after Corti left, Klubertanz saw Friday leave the restaurant and walk toward his car. Detective Topp was walking with Friday. When Topp told Friday he would not be

allowed into the car, Friday returned to the restaurant. A woman who was with Friday then approached the car. She said she was the owner and had the keys, and was going to move it. Klubertanz told her that she would not be allowed to do that.

At this time, Klubertanz saw Friday walking toward the car and heard him yell something like, "Don't tell them anything." Friday approached the passenger side of the car with keys in hand, said he was taking the car, and told the officers that if they wanted to stop him they would have to do it physically. After a struggle during which Friday told Klubertanz he would fight her, Friday was handcuffed and told he was under arrest for obstructing.

While this was going on, Dino Corti placed a phone call to Lt. Pieper. Corti told Pieper that he had been called to tow Friday's car but that he didn't want anything to do with it because he knew that Friday had cocaine in it. Pieper relayed this information to Dandurand.

In view of the above facts, I conclude the police had probable cause. The police reasonably inferred from Friday's conduct in the restaurant that he was selling illegal drugs. It is also reasonable to infer that while Friday knew that the police were watching him, he orchestrated several schemes to have his car removed from the area. He called to have it towed, an acquaintance claiming to be the owner tried to move it, and Friday himself had to be restrained from entering it. Friday's actions, combined with Corti's statements made to police on the scene, establish a reasonable probability that drugs were in Friday's car.

Because Corti had been a police informant, the majority concludes that his statements to the police require greater proof of reliability than those of

ordinary citizens. Since Corti did not tell Klubertanz or Pieper why he believed that Friday's car contained drugs, the majority states that the officers could not be sure that the information was not based on casual rumor or Friday's general reputation.

The sequence of events leads to a reasonable inference, however, that Corti obtained the information concerning the drugs when he talked to Friday and that his information was therefore reliable. Corti had been called to tow a car, he drove to the restaurant and hooked the car to his truck. After his conversation with Friday, Corti unhooked the car, told police there were drugs in it, and left.

The majority overstates the importance of Corti's having been a police informant. It does not follow that every time a police informant talks to the police he acts in that capacity. The distinction between a citizen informer and a police informer when testing reliability for probable cause is whether the informer has an expectation of some gain or concession in exchange for the information. *Loveday v. State,* 74 Wis. 2d 503, 524, 247 N.W.2d 116, 128 (1976). It is the expectation or concession which renders suspect information supplied by a police informant.

The record contains no evidence or basis for the inference that Corti expected some gain or concession in exchange for Corti's information. Corti's critical statement was to Officer Klubertanz. Corti made the statement in response to Klubertanz' asking whether Friday had called him. Corti was not acting as a police informant when he told Klubertanz that Friday wanted the car towed, that there was dope in it and that Corti did not want anything to do with it. Consequently, the police had no reason to doubt the

reliability of Corti's two statements that Friday's car had dope in it.

In addition to probable cause, a warrantless search of an automobile requires exigent circumstances, *Donovan,* but a slight showing of exigency is sufficient. *State v. Wisumierski,* 106 Wis. 2d 722, 738, 317 N.W.2d 484, 492 (1982). While Officer Klubertanz was watching Friday's car, three persons, including Friday, tried to take it. Friday was with a large number of people and made many phone calls. There was no reason to believe that there would not be other attempts to get the car. This establishes an exigency.